| | | |
|---|---|---|
| In re: | ) | Case No. 17-11592 |
| | ) | |
| RENT-A-WRECK OF AMERICA, INC., *et al.,* | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered: |
| | ) | Re: Dckt. No. 1 |
| | ) | |
| | ) | **Hearing date: October 18, 2017, at 2:00 p.m.** |
| | ) | **Objection Due: October 11, 2017, at 4:00 p.m.** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS, OR ALTERNATIVELY, TO TRANSFER VENUE

Pursuant to 11 U.S.C. § 1112(b), 11 U.S.C. § 305(a), the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court, Creditors David S. Schwartz and Rent A Wreck, Inc. (collectively, "Mr. Schwartz" or "Schwartz"), by and through their undersigned counsel, hereby submit the instant memorandum of points and authorities in support of their Motion to Dismiss, or alternatively, to Transfer Venue (collectively, the "Motion") against Debtors Rent-A-Wreck of America, Inc. and Bundy American, LLC ("Bundy") (collectively, "Debtors" or "RAWA"), and state as follows:

## INTRODUCTION

This case is the latest chapter in a dispute that has consumed more than 10 years between two opponents who have been pitted against one another in a winner-take-all contest in the United States District Court for the District of Maryland ("District of Maryland"). When John J. Fitzgerald ("Fitzgerald") bought RAWA in 2006, one of the first decisions he made was to terminate David Schwartz, the original founder of Debtors RAWA and Bundy; the man who created the Rent-A-Wreck trade name, and the undisputed father of the concept of renting well-running, but well-used automobiles, playfully named "wrecks." Schwartz's opponent is a millionaire (more than a hundred times over). Fitzgerald owns and controls Debtors, Debtors'

affiliated entities and insider-creditors, and dozens of car dealerships stretching up and down the Eastern seaboard.

In the summer of 2007, Fitzgerald started Round One of the current donnybrook. Angered by Schwartz's failed attempt to stop Fitzgerald from buying the Rent-A-Wreck franchising network that Schwartz had created, Fitzgerald tried to terminate Schwartz by removing Schwartz's business from the national Rent-A-Wreck internet directory, and told Schwartz that he must sue to be placed on the website. Mr. Schwartz did sue, and his business contact information was, in fact, returned to the national Rent-A-Wreck website by a court injunction in 2007.

Round One continued with Debtors throwing a combination of counter-punches. In the first series, Fitzgerald directed Debtors to sue Mr. Schwartz for millions, claiming that Schwartz infringed the very trademark that he coined. Next, Debtors jabbed at Schwartz by manipulating and unfairly representing Schwartz's business listing on Debtors' national website. And, for a knock-out punch, Debtors again attempted to terminate Mr. Schwartz franchise rights, exclusive territory and right to do business under the Rent-A-Wreck logo as he had since the late 1960s.

Three scorekeepers -- the jury, the Honorable Judge Peter J. Messitte of the District of Maryland ("Judge Messitte"), and the Court of Appeals for the Fourth Circuit (the "Fourth Circuit") – ruled that Schwartz won the first round. All three scorekeepers found that Schwartz had court-ordered rights to operate his Rent-A-Wreck franchise, royalty free and without payment to Debtors, for his lifetime. And, Judge Messitte found that Debtors were required to maintain Schwartz's business listing on its national website, and were forbidden from diverting business away from Schwartz, just as if he were any other franchise. *See Schwartz, et al. v. J.J.F. Mgm't Servs., Inc., et al.,* Case No. 1:07-cv-01679-PJM in the District of Maryland; *see also*

*Schwartz v. Rent-A-Wreck of Am., Inc.*, 468 Fed. Appx. 238 (4th Cir. 2012) (referred to herein as *Schwartz I*).

Fitzgerald directed Debtors to appeal. The Fourth Circuit then set the stage for Round Two by remanding the case to the District of Maryland to determine whether Mr. Schwartz was sufficiently protecting the RAWA trademark in his exclusive territory in Los Angeles, California. *Id.*

In June 2013, Round Two began before Judge Messitte and a District of Maryland jury. At the end of Round Two, the jury, Judge Messitte, and ultimately the Fourth Circuit, unanimously ruled in favor of Schwartz, confirming his right to continue his exclusive territory. *See Schwartz v. Rent-A-Wreck of Am., Inc.*, 603 Fed. Appx. 142 (4th Cir. 2015) (referred to herein as *Schwartz II*).[1]

Round Three began in the spring of 2016, when Debtors launched another offensive attack against Schwartz. In April 2016, Debtors' call center and customer service representatives, under Debtors' direction, began falsely telling prospective customers who were trying to rent cars from Schwartz, that his business was closed. Debtors' agent suggested, in scripted, rote fashion, that those customers attempt to rent from other Rent-A-Wreck or Priceless franchises scattered throughout the State of California. Schwartz learned of Debtors' scheme and, responded by moving for contempt against Debtors for violating court orders.

For over a year, Judge Messitte considered Schwartz's and Fitzgerald's briefs, testimony adduced at evidentiary hearings, and arguments. Judge Messitte's comments and observations during those hearings are particularly instructive of how Debtors' mistreated Schwartz.

---

[1] Case No. 1:07-cv-01679-PJM, *Schwartz I* and *Schwartz II* are collectively referred to herein as the "Maryland Litigation."

In a scathing opinion, Judge Messitte found Debtors' conduct to be consistent with, and a continuation of, Fitzgerald's direct threats to "take everything Schwartz own[ed]," and to "see how high he would jump," by terminating Schwartz's franchise. Judge Messitte specifically considered, and roundly rejected, Debtors' excuse that their conduct was inadvertent, and instead, found that Debtors' tactics were sharp, intentional, in bad faith, and ultimately, contemptuous. On June 29, 2017, Judge Messitte stopped Round Three by finding Debtors to be in contempt of a court order, and by entering a $83,680.20 judgment in Schwartz's favor, against Debtors, jointly and severally.

Just twenty-five days following the entry of Judge Messitte's Contempt Judgment, Debtors filed the instant consolidated bankruptcy petitions signaling the beginning of Round Four. Debtors' motivation to transfer this fight to this arena is patently obvious. Debtors had lost every round before Judge Messitte and the Fourth Circuit, and were desperately in search of a different forum, different rules, and a different referee.

At the beginning of this round, Debtors literally swore to make this a fair fight by declaring that they "intend[ed] to perform their obligations to Schwartz in keeping with their understanding of the orders of the Maryland Court and the Fourth Circuit." ECF No. 8 (Declaration of Gregg Steinbarth), ¶ 22.[2] But true to pattern and practice, however, Debtors have once again attempted to "take everything Schwartz owns" by attempting to use this Court's bankruptcy provisions to reject and terminate Schwartz's court-ordered franchise rights. *See* ECF. No. 91 (Debtors' Motion to Reject Schwartz's so-called Executory Contract).[3]

---

[2] Unless stated otherwise, all references to "ECF No." in the instant filing will refer to docket entries in the instant bankruptcy action.

[3] Simultaneously with the instant filing, Schwartz is also filing a Response in Opposition to Debtors' Motion to Reject. It is Schwartz's position, however, that consideration of, and a ruling on, the instant Motion to dismiss should precede that of Debtors' Motion to Reject and

Deep into Round Four, Schwartz is still fighting to save his 50-year old franchise, to preserve the contempt judgment granted by Judge Messitte, and to enforce the orders and decisions of the jury, Judge Messitte and the Fourth Circuit, which he obtained during more than 10 years of hard-fought litigation.

At bottom, Debtors' consolidated bankruptcy petitions were not filed in the good faith that this Court requires. This is a two-party dispute. Debtors profess (unconvincingly) to be insolvent as a result of the $2.7 million in attorneys' fees and costs they spent in fighting Schwartz for ten (10) years. Putting aside the fact that Debtors' started each and every round of the fight, Debtors did not claim insolvency when they were paying attorneys hundreds of thousands of dollars to attempt to obtain a multi-million dollar judgment against Schwartz (Round One), or when attempting to take away his franchise rights (Round One), or when attempting to take away his exclusive territory for their own benefit (Round Two), or during the contempt proceedings flowing from their surreptitious and unilateral campaign to tell Schwartz's customers he was out of business (Round Three). Instead, Debtors' feigned insolvency at the precise time it was ordered to pay Schwartz's contempt judgment. Simply put, this case is yet another effort to terminate Schwartz's well-established right to do business as a Rent-A-Wreck franchise.

And, for good measure, Debtors seek to avoid the judge (Judge Messitte) that made the unassailable, unambiguous rulings under which Debtors must abide, and whose Court is charged with enforcing Debtors' compliance with such rulings.

Debtors' bankruptcy petitions are shams – they seek to accomplish indirectly what they Debtors failed to do directly in the Maryland Litigation, *i.e.*, terminate Schwartz. Indeed,

---

Schwartz's Response in Opposition thereto. Only to the extent this Court denies the Motion to dismiss should the merits of Debtors' Motion to Reject be considered.

Debtors' long, storied and irrefutable pattern and practice of fighting dirty against Schwartz makes the instant bankruptcy reek of bad faith. In this motion, Mr. Schwartz asks this Court to dismiss the case, and to disqualify Debtors from seeking this Court's protection under the guise of bankruptcy. Debtors have come to this fight with unclean hands, tarnished and stained with contempt for and against their long-time foe, Schwartz.

For reasons stated *infra*, Schwartz hereby requests this Court to dismiss Debtors' bankruptcy case under 11 U.S.C. §§ 1112(b) and/or 305(a). Dismissal is proper under 11 U.S.C. § 1112(b) because Debtors' bankruptcy filings lack good faith, have no proper purpose, and were forum-shopped in this Court to gain a tactical litigation advantage over Schwartz, which could not be gained during a decade of litigation before the District of Maryland and the Fourth Circuit. Dismissal is also and/or alternatively proper under 11 U.S.C. § 305(a) because it is in the interests of all interested parties and this Court to halt Debtors' destructive efforts in bankruptcy.

Alternatively, Schwartz respectfully requests this Court to transfer the instant bankruptcy litigation (including all future adversary, ancillary, and/or related matters) to the United States Bankruptcy Court for the District of Maryland, Southern Division to ensure that the same forum that issued orders confirming Mr. Schwartz's franchise rights also governs Debtors' latest attempt to terminate those same rights under the guise of bankruptcy.

### Factual Background and Procedural History Between the Parties

### Rounds One and Two:
### Trials Before Judge Messitte in the District of Maryland and Appeals to the Fourth Circuit

Nearly a decade ago, at Debtors' insistence, Mr. Schwartz brought this case to preserve his right to use the Rent-A-Wreck name – a name which he created, promoted, and had used since the 1960s in connection with his Los Angeles rental car business – and to preserve his right to be advertised accurately and fairly by Debtors RAWA and Bundy.

In June 2007, Debtors, with full-knowledge of the well-publicized course of dealing between or amongst themselves and Mr. Schwartz, removed Schwartz's contact information from RAWA's national website. The impact of this termination was swift and profound. One customer immediately complained that she thought Mr. Schwartz's Rent-A-Wreck went out of business because she could not find his contact information on RAWA's website. The phones, which once rang often, became eerily silent.

Mr. Schwartz called RAWA to be returned to the website. RAWA's company line to Mr. Schwartz was, "if you want to try to get [back] on, sue us." *See* Ex. 1, Excerpts of Transcript from Case No. 1:07-cv-01679-PJM, Apr. 2, 2010, T. 56:19-21. In response to Debtors' ultimatum, Mr. Schwartz filed Case No. 1:07-cv-01679-PJM (*i.e.* Round One) in the United States District Court for the District of Maryland, Southern Division, seeking a court order commanding Debtors to restore his business listing to RAWA's website.

On July 24, 2007, the District of Maryland granted Mr. Schwartz a Temporary Restraining Order thereby preserving the *status quo* and ordering Debtors to place Mr. Schwartz's business back on the national RAWA website. In response, Debtors filed a multi-million dollar counterclaim against Mr. Schwartz for trademark infringement alleging that Mr. Schwartz's use of Rent-A-Wreck marks (which he had created and used for nearly 40 years by then) caused Debtors substantial damages in the form of lost profits. *See* Doc. No. 15.[4]

Soon after Debtors filed their counterclaim, Mr. Fitzgerald (owner of RAWA) flew in his private jet to Mr. Schwartz's former business location on West Pico Boulevard, closely approached Mr. Schwartz and in an intimidating voice, told Mr. Schwartz that he'd better get himself a good trademark attorney because he, Mr. Fitzgerald, was "going to take everything

---

[4] Unless stated otherwise, all references to "Doc. No." in the instant filing will refer to docket entries in Case No. 1:07-cv-01679-PJM. *Compare* the instant footnote *with* n. 2, *supra*.

[Mr. Schwartz] own[ed]." *See* Ex. 2, Excerpts of Transcript from Case No. 1:07-cv-01679-PJM, Apr. 6, 2010, T. 55:4-8 (alterations supplied).

In addition to delivering this private threat, Mr. Fitzgerald publicly discussed his campaign to ruin Mr. Schwartz's finances. On November 16, 2007, months after this Court ordered Debtors to return Mr. Schwartz's business to the RAWA website, Mr. Fitzgerald was quoted in the *Baltimore Sun* as having kicked Rent-A-Wreck's "founding franchisee off the company's Web site, just to 'see how high he jumps.'" *See* Ex. 3, Jay Hancock, *Tough Guys Don't Quit*, Balt. Sun, Nov. 16, 2007.[5]

During the first trial, Mr. Fitzgerald, a millionaire by a magnitude of more than a hundred, and in accordance with his threat to take everything Mr. Schwartz owned, sought: (1) nearly $6.5 million of dollars in lost profits from Schwartz; (2) Debtors' attorneys' fees (more than $611,000 at the time); and (3) more than $471,000 for prospective corrective advertising.

After an eleven (11) day jury trial, the jury correctly refused to award Debtors one cent of the millions which they sought. Not only did Mr. Schwartz prevail on Debtors' trademark infringement claims, but Mr. Schwartz also prevailed on their attempts to stop him from continuing his business under the "Rent-A-Wreck" banner in his Los Angeles territory.

Debtors appealed the first jury verdict to the Fourth Circuit. While Debtors' appeal was pending, Mr. Schwartz moved to enforce the district court's final order of declaratory judgment. *See* Doc. No. 362. After a March 2, 2011 hearing on the same, Judge Messitte issued an Order stating in pertinent part:

---

[5] Mr. Hancock's testimony at the second jury trial (preceding *Schwartz II*), confirmed that his reporting was accurate, and that Mr. Fitzgerald told him that he (Fitzgerald) terminated Mr. Schwartz just to "see how high he jumps." *See*, *generally*, Ex. 4, Excerpts of Transcript from Case No. 1:07-cv-01679-PJM, Jun. 19, 2013.

> [Debtors'] Call Center shall in no way attempt to dissuade prospective customers from connecting with [Mr. Schwartz's] business or in any way attempt to divert business from [Mr. Schwartz's] exclusive business territory to other franchises.

Doc. No. 382, attached hereto as Ex. 5, at p. 2 (alterations supplied). That Order remains in place to this day.

The Fourth Circuit largely upheld the jury's verdict, but remanded the case for another jury trial to consider whether Mr. Schwartz's exclusive territorial provision forecloses competition in a substantial share of the market of the affected line of commerce. *See Schwartz v. Rent-A-Wreck of Am., Inc.*, 468 Fed. Appx. 238 (4th Cir. 2012), a copy of which is attached hereto as Ex. 6. Round One ended in Mr. Schwartz's favor with this ruling.

A second jury trial (Round Two) began in June 2013, during which Debtors challenged the validity of Mr. Schwartz's exclusive territory. The second jury found that Mr. Schwartz's exclusive territory – in which he had operated since 1977 – was valid.

Debtors, again, appealed the jury verdict. The Fourth Circuit, again, upheld the second jury verdict in Mr. Schwartz's favor. *Schwartz v. Rent-A-Wreck of Am., Inc.*, 603 Fed. Appx. 142 (4th Cir. 2015), a copy of which is attached hereto as Ex. 7. Round Two ended in Mr. Schwartz's favor with this ruling.

Mr. Schwartz thereafter filed a Bill of Costs to recoup costs (not attorneys' fees) incurred during this nearly decade long litigation. The Clerk of the District of Maryland entered a cost award in Mr. Schwartz's favor of $13,405.11. *See* Doc. No. 525. To no one's surprise, Debtors challenged that award of costs, *i.e.*, appealed to Judge Messitte. *See* Doc. No. 526. Debtors' motion challenging the award of costs was denied, and Judge Messitte affirmed the Clerk's Order Taxing Costs (Doc. Nos. 535-36), but Debtors did not promptly pay the ordered costs.

## **Round Three: Contempt Proceeding**

On May 3, 2016, Schwartz filed a Motion to Enforce Court's Order and for Contempt ("Contempt Motion"). In so moving, Schwartz argued that Debtors contemptuously violated Judge Messitte's aforementioned March 2, 2011 Order (Ex. 5) by dissuading his prospective customers from connecting with his business, or from otherwise diverting business from him: by falsely communicating to Mr. Schwartz's prospective customers that his business was closed; by diverting those customers to other Rent-A-Wreck and/or Priceless franchisees; and from intentionally and knowingly displaying incorrect business contact information (address, days and hours of operation) for Schwartz's franchise on the national Rent-A-Wreck website for at least four (4) years, while ignoring Schwartz's repeated requests to correct the knowingly false information. *See* Doc. No. 528.

On September 30, 2016, the Court held a Show Cause Hearing on Schwartz's Contempt Motion. At the close of the hearing, Judge Messitte recounted Debtors' history of bad faith during the course of the litigation, and found Debtors' incorrect website listing and diversion of potential customers from Schwartz to be contemptuous. While re-counting Judge Messitte's entire finding would spill far too much ink over far too many pages, excerpts of his admonishments of Debtors, and resulting ruling, are as follows:

- When discussing Debtors' display of incorrect information for Schwartz's franchise on the Rent-A-Wreck website, Judge Messitte stated "[l]et me cut to the chase here, Mr. Janssen [Debtors' counsel in the Maryland Litigation]. This issue of the address is really troublesome. I don't know what you were thinking when you had them change back to the new -- to the old address. What possible justification do you have for that? That, really, evidence is **bad faith** in my view." Ex. 8, Excerpts of Transcript from Case No. 1:07-cv-01679-PJM, Sept. 30, 2016 Hr'g, T. 118:2-7 (alterations and emphasis supplied);

- When recalling Debtors' motives behind the litigation with Schwartz in the Maryland Litigation, Judge Messitte stated: "let me also be very candid… **I have no doubt that Mr. Fitzgerald has tried to make things hot for Mr. Schwartz from the beginning**." *Id.* at 118:11-13 (alteration and emphasis supplied).

- When linking Debtors' questionable practices against Schwartz with Mr. Fitzgerald, Judge Messitte noted that Debtors played the Maryland Litigation "really sharp. That's what [they] have done throughout the case. **That's what's really troublesome here. And it goes back to Mr. Fitzgerald. He is the one who said, Make it hot for [Mr. Schwartz].** I see it. I have seen it from the beginning." *Id.* at 119:11-14 (alterations and emphasis supplied).

- When noting the sharp litigation practices Debtors undertook against Schwartz in the Maryland Litigation, Judge Messitte opined that "**it's troublesome . . . the way [Debtors have] defended [the Maryland Litigation]**. It's really to, at every turn, to make things hot for [Schwartz]. It really is not the way litigation, in my view, is admirably conducted." *Id.* at 122:20-24 (alterations and emphasis supplied supplied).

- When recalling Debtors' handling of the Maryland Litigation against Schwartz, Judge Messitte noted that "there is a framework in this case, and **the Court cannot avoid it**. And it is clear, from the beginning of this case, that the **[Debtors] have done just about everything they can do to . . . make it hot for [Schwartz]**. They have really tried to make it difficult, and there has been kind of a legalistic, sharp handling of the way this case has gone forward in order to evaluate whether, in fact, the testimony that has been given today about [Debtors'] so-called mistake is, in fact, criminal." *Id.* at 128:15-24 (alterations and emphasis supplied).

- When discussing Debtors' bad faith and/or intentional misconduct towards Schwartz, Judge Messitte started with Debtors' owner, Fitzgerald, and stated "**[t]here is no question** Mr. Fitzgerald, it's clear, I accept the testimony that Mr. Schwartz gave, and I think it's corroborated, **that Mr. Fitzgerald was going to basically make [Schwartz] pay**…[.]" *Id.* at 128-129. (alterations and emphasis supplied).

- When discussing Debtors' previous misconduct of purposely publishing incorrect information about Schwartz on the national RAWA website from roughly 2012 through 2016, Judge Messitte said "[w]as that misleading? Of course, it was. **Of course, it was misleading** to customers to give the wrong address [for Schwartz]." Ex. 8 at 129:20-22. (alterations and emphasis supplied).

- When continuing his discussion on Debtors' previous misconduct of purposely publishing incorrect information about Schwartz on the national RAWA website, Judge Messitte summarized that "[f]rankly, **the [District of Maryland] finds bad faith on the part of the [Debtors]** in connection with that transaction." *Id.* at 130:3-4 (alterations and emphasis supplied).

- When discussing Debtors' intentional misconduct of (incorrectly) telling prospective customers that Schwartz's business had closed, Judge Messitte ruled that Debtors "**were in contempt** of the [District of Maryland's] order of March 4, 2011, in that **they did intentionally attempt to dissuade prospective customers from connecting with [Schwartz's]** business…[.]" *Id.* at 131:23-25 (alterations and emphasis supplied).

At the conclusion of the September 30, 2016 Contempt Hearing, Judge Messitte found RAWA in contempt of the Court's Order of March 4, 2011, in that for several weeks, Debtors deliberately and intentionally dissuaded prospective customers from connecting with Schwartz's business. *Id.* at 131:24-25.[6]

In fact, Judge Messitte predicted that even his finding of contempt would not deter Debtors from continuing such bad faith against Schwartz:

> **[O]ne hopes [Debtors' misconduct towards Schwartz] wouldn't happen again, but, really, the history of the [Maryland Litigation] is such that for every technical glitch, every technical possible opposition to the successful operation of Mr. Schwartz's business, there is going to be a resistance [from Debtors] that attempts to make it hot for him.**

*Id.* at T. 131:14-19 (alterations and emphasis supplied).

On February 27, 2017, the Court held an additional Contempt Hearing to take additional evidence on Schwartz's damages. During this hearing, Gregg J. Steinbarth, Esq., JJFMS's General Counsel and RAWA's Director and Assistant Secretary, testified that he (not Debtors' litigation counsel, Daniel Janssen) gave instruction to Debtors to carry Schwartz's incorrect business address over the course of four (4) years. Judge Messitte, hearing Steinbarth's admissions, opined that "**this is a very troublesome case** in that **clearly wrongdoing [by Debtors] occurred** here…[.]" *See* Ex. 10, Excerpts of Transcript from Case No. 1:07-cv-01679-PJM, Feb. 27, 2017 Hr'g, T. 100:24-25 (alterations and emphasis supplied).

---

[6] At the September 30, 2016 hearing, after the Court inquired whether Debtors satisfied the outstanding Bill of Cost, counsel for RAWA handed Schwartz's counsel a check for $13,405.11 to cover the court-ordered costs. Judge Messitte found that the fact that "RAWA waited until the filing of Schwartz's Motion and the day of the hearing to make the tender was yet another indication of RAWA's apparent strategy, proclaimed at the outset by Debtors' principal operative, Mr. Fitzgerald, to make Schwartz sweat at virtually every stage of the proceedings." Doc. No. 580, attached hereto as Ex. 9, n. 2.

On June 29, 2017, Judge Messitte issued Final Order of Judgment finding Debtors' in contempt of court, outlining a number of remedies which Debtors' must practice to cure the harm to Schwartz, and entering judgment against Debtors, jointly and severally, in the amount of $83,620.80. *See* Doc. No. 581, attached hereto as Ex. 11. Judge Messitte supported his finding with a Memorandum Opinion of the same date. *See* Ex. 9.

Judge Messitte began his opinion by noting that "[w]hile the procedural history of the case is long,[] for present purposes it is sufficient to say that, after two appeals to the Fourth Circuit, the rights and obligations of the parties have been fully established." *Id.*, at p.1. (footnote omitted recounting the procedural history of the Maryland Litigation).

Judge Messitte's opinion noted that:

- Debtors "**deliberately**" violated his Order from March 4, 2011 to not divert business from Schwartz's franchise. *Id.*, at p. 2 (emphasis supplied).

- Debtors had engaged in an "**apparent strategy, proclaimed at the outset by [Debtors'] principal operative, Jack Fitzgerald, to make Schwartz sweat** at virtually every stage of the proceedings." *Id.*, at p. 2, n.2 (alterations and emphasis supplied).

- Debtors "**intentionally diverted**" prospective customers away from [Schwartz's] business." *Id.*, at p. 4 (alteration and emphasis supplied)..

- In rejecting Debtors' unconvincing arguments of inadvertent conduct, Judge Messitte noted, "it is **simply incredible** that [Debtors'] call center employees could have believed that either [Debtors] had no franchise in West Los Angeles – the second largest city in the United States – or that one might have shut down virtually overnight without any warning or prior announcement by their superiors. This **extreme improbability** is highlighted by the fact that [Debtors] for nearly nine years, had been engaged in **extraordinarily intense litigation with Schwartz** regarding the RAWA franchise in West Los Angeles." *Id.* at p. 6 (alterations and emphasis supplied).

- "[Debtors] offer[] **flimsy rationales** for [their] decision to publish information that it knew was outdated and incorrect . . . [.]" Ex. 9, at p. 7, and n.5 (alterations and emphasis supplied).

- Debtors have "**consistently not acted in good faith**…[.]" *Id.*, at p. 7, and n.6 (alterations and emphasis supplied).

- Judge Messitte continued, "**Taken together with the earlier direct verbal threats made by [Debtors'] CEO Jack Fitzgerald to Schwartz** that he was going to make things difficult for Schwartz and take everything Schwartz had, the Court concludes that RAWA's diversion of business from Schwartz's franchise in or about April 2016 was **clearly and convincingly deliberate and intentional**, not merely accidental or negligent." *Id.*, at p. 7-8 (alterations and emphasis supplied).

- Judge Messitte concluded, "at no time did [Debtors] demonstrate a good faith attempt to comply with the Court's March 4, 2011 Order. Its failures to advise or instruct its employees about the importance of the West Los Angeles franchise or to advise then as to the outcome of protracted and intense legal proceedings or of the need to treat Schwartz fairly completely undercut any profession of good faith. Once again, the history of the litigation looms large. Statements by RAWA's CEO Fitzgerald about his intention to see "how high" he could make Schwartz "jump" and how he was going to take everything Schwartz owned, RAWA's decision to change the correct address and hours for Schwartz's franchise listed on RAWA's website to an address and hours it knew were incorrect (having done so on the advice of counsel), RAWA's repeated refusal to change the address and hours back when Schwartz requested RAWA to do so, and RAWA's delay in paying court-ordered costs **clearly convince the Court that RAWA did not act in good faith** when its call center employees diverted business from Schwartz's franchise in or about April 2016. *Id.*, at p. 10 (alteration and emphasis supplied).

On July 24, 2017, twenty-five days following Judge Messitte's careful explanation of Debtors' bad faith, each of the Debtors filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code. In support of Debtors' bankruptcy petitions, Mr. Steinbarth, Esq., a Board of Director to RAWA, and general counsel to both Debtors, swore, under the penalty of perjury, that "Debtors intend to perform their obligations to Schwartz in keeping with their understanding of the orders of the Maryland Court and the Fourth Circuit…[.]" ECF No. 8, ¶ 22.

Yet just five weeks later, on September 1, 2017, Debtors changed course and, again, have sought to terminate Schwartz's franchise rights by filing a motion seeking this Court's (not the

District of Maryland's) approval to reject its so-called "executory contract" with Schwartz. ECF No. 91.

Debtors have now turned to Chapter 11 bankruptcy – not for a legitimate or necessary reorganization – but solely for one final opportunity to "take everything that Mr. Schwartz owns," and to "see how high Mr. Schwartz will jump" in front of a new court that is not privy to its malicious history against Schwartz. Debtors' instant motion seeks to undo the rights Mr. Schwartz gained at each step of the way over 10 years of litigation – rights granted by injunctive relief in 2007 and 2008, a Maryland jury in 2010, Judge Messitte in 2011, the Fourth Circuit in 2012, another Maryland jury in 2013, the Fourth Circuit, again, in 2015, and Judge Messitte, again, through Contempt Proceedings just months ago. In short, Debtors seek to use this Court to obtain, what it repeatedly tried to, but could not, during a decade of litigation in an unfavorable forum. As will be detailed *infra*, this bankruptcy Court is no place for Schwartz's and Debtors' two-party dispute, and accordingly, this Court should dismiss the above-captioned bankruptcy case with prejudice.

**ARGUMENT**

**I.      This Court Should Dismiss Debtors' Bankruptcy Petition Pursuant to Either 11 U.S.C. §§ 1112(b) or 305(a).**

**A.      Debtors' bankruptcy petition was filed in bad faith, and should be dismissed pursuant 11 U.S.C. § 1112(b).**

**1.      Legal standard for dismissing Chapter 11 petition under 11 U.S.C. § 1112(b).**

Pursuant to 11 U.S.C. § 1112(b), this Court should dismiss Debtors' bankruptcy petition "for cause," which the Third Circuit has interpreted to mean petitions that were not filed in good faith. *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004)); *In re SGL Carbon Corp.*, 200 F.3d

154, 160 (3d Cir. 1999). The burden to prove a filing was made in good faith is **on the bankruptcy petitioner**. *See In re 15375 Mem'l Corp.*, 589 F.3d at 618; *In re SGL Carbon Corp.*, 200 F.3d at 162, n.10.

"The 'good faith' requirement for Chapter 11 petitioners has strong roots in equity." *In re SGL Carbon Corp.*, 200 F.3d at 161. In *SGL Carbon Corp.*, the Third Circuit discussed the purpose behind the good faith requirement of 11 U.S.C. § 1112(b) as follows:

> A good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.' Another basic underpinning of the good faith doctrine is the equitable concept of clean hands. As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion.
>
> $*$ $*$ $*$
>
> A good faith standard furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way[.]

200 F.3d at 161-62 (citations and quotations omitted).

There are two inquiries that are relevant to this question of good faith: "'**(1) whether the petition serves a valid bankruptcy purpose' and '(2) whether the petition is filed merely to obtain a tactical litigation advantage.**'" *In re 15375 Mem'l Corp.*, 589 F.3d at 618 (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d at 119-20) (emphasis supplied); *In re SGL Carbon Corp.*, 200 F.3d at 165 (noting that a "Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose[,]" that "courts have typically dismissed Chapter 11 petitions" that were filed "merely to obtain tactical litigation advantages[,]" and that where "the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if

not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.") (citations and quotations omitted; alterations supplied).

Some additional factors that this jurisdiction has considered when reviewing a motion to dismiss under 11 U.S.C. § 1112(b) are:

> (a) Single asset case; (b) Few unsecured creditors; (c) No ongoing business or employees; (d) Petition filed on eve of foreclosure; (e) Two party dispute which can be resolved in pending state court action; (f) No cash or income; (g) No pressure from non-moving creditors; (h) Previous bankruptcy petition; (i) Prepetition conduct was improper; (j) No possibility of reorganization; (k) Debtor formed immediately prepetition; (l) Debtor filed solely to create automatic stay; (m) Subjective intent of the debtor.

*In re Crown Village Farm, LLC*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) (quoting *In re Primestone Inv. Partners*, 272 B.R. 554, 557 (D. Del. 2002)).

The good faith requirement of 11 U.S.C. § 1112(b) is a "'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *In re 15375 Mem'l Corp.*, 589 F.3d at 618 (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d at 118).

> 2.      **Debtors' bankruptcy petitions were not filed in good faith, lack a valid purpose and were filed merely to obtain a tactical litigation advantage over Schwartz.**

Debtors' instant bankruptcy action has all the hallmarks of being filed in bad faith. When considering the propriety of this action, the Court cannot ignore Debtors' conduct toward Schwartz over the past decade and Judge Messitte's unambiguous findings of Debtors' bad faith. In short, Debtors' pattern and threats, combined with conduct designed to "take everything" Schwartz owns, "see[] how high they could make Schwartz jump," and "mak[e] it hot" for

Schwartz, fatally poisons this proceeding in which Debtors seek to terminate Schwartz's inveterate franchise rights.

The timing of Debtors' petition less than four (4) weeks after Judge Messitte entered a contempt judgment – and not before or during the earlier rounds of the Maryland Litigation – evidences that Debtors filed not for valid restructuring or reorganization purposes, but as a litigation tactic to stay and discharge Schwartz's collection on his contempt judgment.

Plainly, Debtors' petitions (and subsequent motion to reject Schwartz's franchise) are thinly-veiled, manufactured attempts to gain a tactical advantage over Schwartz which Debtors could not gain in over a decade of litigation before the District of Maryland and the Fourth Circuit.[7]

### 3. The *In re Crown Village Farm, LLC* factors also require dismissal pursuant to 11 U.S.C. § 1112(b).

**Factor (b), Few unsecured creditors:** Debtors' creditor structure highlights that it is solvent, and that the instant bankruptcy petitions are bad faith, litigation tactics against Schwartz.

---

[7] This Court has once before presided over a corporate dispute that was inexplicably thrown into the bankruptcy arena without reason. *See*, *generally*, *In re Ofty Corp.*, 44 B.R. 479 (Bankr. D. Del. 1984). In the underlying dispute to *Ofty*, a judge found that the majority shareholders of the corporation were self-dealing and breaching fiduciary duties, and ordered that the corporation's assets be liquidated by a receiver. *Id*. at 481. The corporation, at the whim of the self-dealing directors, immediately filed for Chapter 11 bankruptcy protection to avoid the court's order, only to have the receiver move to dismiss the bankruptcy action under 11 U.S.C. §§ 1112(b) and/or 305(a). *Id*. at 482. This Court, in turn, declared that "it [was] clear that the sole purpose of the [bankruptcy] filing was to circumvent the effect of the District Court order entered to resolve years of dispute which the parties could not resolve among themselves[,]" and granted the motion to dismiss the bankruptcy action. *Id*. at 482 (alterations supplied).

Similar to *Ofty*, Debtors and Schwartz have been involved in years of prior litigation, the culmination of which resulted in the Fourth Circuit affirming Schwartz's protected franchise and the District of Maryland ordering (and re-ordering after a finding of contempt) Debtors to not divert business from Schwartz. Debtors, like the self-dealing shareholders in *Ofty*, are now trying to "circumvent the effect of the District Court order[s]" through the instant bankruptcy. *Id*. at 482 (alteration supplied). This Court, like it did in *Ofty*, should grant Schwartz's motion to dismiss to prohibit Debtors from proceeding in such bad faith and from re-litigating issues that have already been fully contested and decided in Schwartz's favor.

The below table illustrates Debtors' solvency.

### SUMMARY OF DEBTORS' INSIDER VS. NON-INSIDER DEBT [8]

| Insiders | Combined Debt | | Non-Insiders with Significant Debt [9] | Combined Debt |
|---|---|---|---|---|
| **J.J.F. Management Services, Inc.** (sole shareholder of RAWA) | $2,971,967.47 +$13,592.24 **$2,985,559.71** | | **David Schwartz & Rent A Wreck Inc.** | **$83,620.80** |
| **AllCar Leasing, Inc.** *See* ECF No. 70 at p. 20, (listed as having same address and phone number as RAWA) | $3,292.04 +$143,318.00 **$146,610.04** | | **Lancer Insurance Company** | **$18,572.70** |
| **Bundy American, LLC** (Co-Debtor) | **$725,379.00** | | **Triad Insurance Company** | **$20,568.87** |
| **KFL, LLC** *See* ECF No. 23 at p. 3, Debtors' Organizational Chart | $108,295.00 +$107,542.00 **$215,837.00** | | **Kayak** | **$7,069.76** |
| **MBRC, LLC** *See* ECF No. 23 at p. 3 | **$2,990,504.00** | | **National Computer Services Consultants** | **$5,630.00** |
| **Consolidated Automobile Rental Insurance, LTD** *See* ECF No. 23 at p. 3 | **$37,732.00** | | **Plave Koch, LLC** | **$10,614.75** |
| **EMBARC, LLC** *See* ECF No. 23 at p. 3, Debtors' Organizational Chart | **$18,790.00** | | | |
| **Priceless of Maryland, Inc.** *See* ECF No. 23 at p. 3 | **$107,255.00** | | | |
| **RAW Leasing, LLC** *See* ECF No. 70 at p. 20 | **$259,693.00** | | | |
| **Total:** | **$7,487,359.75** | | **Total:** | **$146,076.88** |

**Percentage of Non-insider debt to Total Combined Debt:**       **1.9%**
**Percentage of Schwartz's debt to Total Non-Insider Debt:**       **57.2%**

---

[8] Summarized from Debtors' Schedules (ECF Nos. 68 and 70). No debts listed in those Schedules in an amount of "Unknown" were included in this chart.

[9] "Significant Debt" shall refer to such debt that totals in excess of $5,000 (for simplicity purposes). The amount of "insignificant debt" not accounted for in this chart totals roughly $125,000. Per Debtors' Schedules (ECF Nos. 68 and 70), Debtors' total secured debt is $2,971,967.47; and their total combined unsecured debt is $4,786,953.34. Therefore, Debtors have total debt of $7,758,920.81, which means the table above does not factor in roughly $125,000 of unsecured, non-insider debt.

RAWA's only secured creditor is its sole shareholder, JJFMS, Inc. (which is owned by, and named after, Mr. Fitzgerald). ECF No. 8 at ¶ 18; ECF No. 68 at p. 16; ECF No. 70 at p. 17. The overwhelming majority (more than 98%) of Debtors' secured and unsecured debt belongs to insider creditors. ECF No. 68 at p. 20-21; ECF No. 70 at p. 20.

Schwartz holds a majority of Debtors' unsecured, non-insider debt. ECF No. 1 at p. 9. Tellingly, the next largest unsecured, non-insider creditor is TRIAD Insurance Management with a claim of $20,693.87, and many other unsecured, non-insider creditors have debts listed in an amount *less than $100*.[10] No. 68 at p. 20-21; ECF No. 70 at p. 20. This Court should not allow Debtors to feign insolvency,[11] by padding its schedules with friendly, insider debt from Fitzgerald-owned affiliates and subsidiaries, in hopes of discharging Schwartz's court-ordered

---

[10] Debtors complain of the millions of dollars in litigation fees and costs it has incurred to date in the Maryland Litigation with Schwartz as a reason for its financial problems and bankruptcy filings here. *See*, *e.g.*, ECF No. 8 at ¶ 22. Yet, all of Debtors' counsel in the Maryland Litigation have been paid in full. None of Debtors' counsel from the Maryland Litigation (Shadoan, Michael and Wells, LLP, Quarles & Brady LLP, the Law Offices of John C. Hanrahan, LLC, and Wood Law Offices, LLC) are listed as owning debt of Debtors. *See* ECF Nos. 68 and 70. If Debtors are looking for a fresh start, they could conserve financial resources by refraining from further attempts to terminate Schwartz's franchise rights.

[11] Debtors recently published a Summer 2017 Update to its franchisees touting the company's upcoming, three-day national convention and/or "cocktail party" in Las Vegas, Nevada in October 2017. *See* RAWA Summer 2017 Update, attached hereto as Ex. 12 at p. 8. A cash strapped enterprise would not spend its precious few resources hosting a convention and cocktail party in Las Vegas.

In addition, Mr. Fitzgerald, Debtors' financial backer, has recently boasted that his companies did "$740 million in business" in 2015 alone, and generate "$10 million a year in profit." *See* Thomas Heath, *Fitzgerald Auto Malls' owner has formula for success: Hustle*, The Washington Post (Nov. 15, 2015), attached hereto as Ex. 13, at https://www.washingtonpost.com/business/on-small-business/fitzgerald-auto-malls-owner-has-a-formula-for-success-hustle/2015/11/15/450c3f52-87bd-11e5-9a07-453018f9a0ec_story.html?utm_term=.f4510fa0a74f. In fact, Fitzgerald even estimated that "he could sell his empire for north of $100 million." *Id.* Debtors' claim of insolvency is wholly without merit.

judgment. Once again, thwarting Schwartz's efforts to realize his litigation gains is the true reason behind Debtors' bankruptcy filings.

**Factors (d), Petition on the eve of foreclosure, and (l) Debtor filed solely to create automatic stay, (*i.e.* timing):** The timing of Debtors' bankruptcy petitions – just weeks after Judge Messitte ordered Debtors in contempt and awarded judgment in Schwartz's favor – indicates that Debtors' filings are in bad faith. In support of Debtors' petitions, Mr. Steinbarth, Esq. attested, under oath, that Debtors' financial losses began nearly 12 years ago. *See* ECF No. 8, at ¶ 19. Steinbarth stated that Debtors' financial losses "accumulated prior to the time of the 2006 acquisition," and that "Debtors faced challenges almost immediately thereafter." *Id*. Indeed, Steinbarth claimed that litigation against Schwartz surrounding Fitzgerald's acquisition and merger of Debtors, nearly a dozen years ago, "were costly" and created "uncertainty," which allegedly "stalled Debtors business progress." *Id*. Notably, however, Debtors did not file bankruptcy a dozen years ago.

Next, Steinbarth blamed Debtors' hard financial times on the "economic recession that began in 2008," during which, allegedly, "Debtors' franchise network failed to grow as Debtors [] anticipated, in part because would-be franchisees could not obtain funding for fleets." *Id*. (alteration supplied).[12] Debtors, of course, did not file bankruptcy during, or soon after, the recession, when it alleges that its franchise network suffered.

_____

[12] Debtors' claim that it struggled, or would struggle, to sell franchises during the recession beginning in 2008 is, of course, directly inconsistent with Debtors' position during the Maryland Litigation when attempting (unsuccessfully) to recover damages from Schwartz. In fact, in June 2008, Debtors' expert, James Tennant, opined that Debtors could sell 14 franchises (1 airport location and 13 neighborhood locations) in Schwartz's territory over the course of just two (2) years (at a cost to Debtors of approximately $475,000). *See*, *generally*, Ex. 14, Debtors' 2008 Expert Report from the Maryland Litigation of James Tennant. Tennant further concluded that the "financial rewards for the company will continue for many years and will easily justify the

Next, Debtors blame the "Schwartz Litigation . . . which has lasted almost a decade," for draining its cash reserves, which, allegedly, "could have been reinvested in the business." *See* ECF No. 8, at ¶ 20. Notably, Debtors' largest costs in the Maryland Litigation were their own attorneys' fees – not contempt sanctions – yet Debtors paid every single dime charged by their several counsel in that litigation before initiating the instant bankruptcy proceeding. Debtors allege to have spent $2,700,000 in attorneys' fees and costs (every cent of which was paid) during the 10 years of litigation with Schwartz – costly litigation which was, in large part, their own doing. Case in point, Debtors note that Schwartz commenced suit against them (which is true), but fail to note that Debtors started the underlying Maryland Litigation by first removing Schwartz's business location from its website, refusing to re-post the listing and then daring Schwartz to sue them (which he had no choice but to do, obtaining an Order commanding Debtors to restore his business to its website). Debtors fail to mention that they countersued Schwartz for millions of dollars alleging that he and his business were infringing the very Rent-A-Wreck trademark which he created, and for a host of other causes of action. Of course, all of Debtors' claims were resolved in Schwartz's favor. Debtors fail to note that much of the litigation surrounded their futile attempts to "make it hot" for Schwartz by attempting to take his exclusive territory. And, by attempting to force him to increase his fleet size by more than 1000% in thirty (30) days, or else face termination.[13] Or, for refusing, again, to list Schwartz

---

initial investment" because Schwartz's territory is "perhaps the company's best market." *Id.* at p. 2.

[13] *See* Doc. No. 433, attached hereto as Ex. 15, at p. 1. In 2013, Judge Messitte stopped Debtors' attempt to demand that Schwartz increase his fleet size, and operation, from approximately 150 cars to more than 1700 cars because allowing such tactics would "deprive Schwartz, et al. of the benefit of their judgment – that [Schwartz was] entitled to maintain a royalty-free [] Rent-A-Wreck franchise in a prescribed area of Los Angeles." *Id.* at p. 2 (alterations supplied).

business accurately on its website, and for telling prospective customers that his business was closed.

Continuing to cast blame on Schwartz, Debtors first paid their counsel for the Maryland Litigation, then concluded that they "filed the Chapter 11 Cases to ease the strain on their cash flow – which has been exacerbated by the Schwartz litigation and Schwartz Judgment . . .[.]" *Id.* at 24. However, Debtors' bankruptcy filed twenty-five days after entry of the Schwartz Judgment (and approximately five (5) days before the expiration of Debtors' appeal rights) suggests that it was filed to evade the $83,620.80 Schwartz Judgment -- not in response to cash strains allegedly resulting from the Schwartz litigation. No other conclusion can be reached.

Debtors' attempt to have this Court believe that the Schwartz litigation fees and costs drove it into bankruptcy is disingenuous. Indeed, Debtors would have incurred the lion's share of its attorneys' fees and expenses before or during the first jury trial in April 2010, or before or during the second jury trial in June 2013. But the Schwartz Litigation did not bankrupt Debtors then. Rather, Debtors would have this Court believe that the Schwartz Litigation finally bankrupted Debtors now -- less than four (4) weeks after entry of the Schwartz Judgment. Debtors' contention that the Schwartz litigation fees and costs, and the prospects of making good on the Schwartz Contempt judgment, has driven it to bankruptcy is, in Judge Messitte's words, "simply incredible." Ex. 9, at p. 6.

**Factor (e), two-party dispute:** As stated above, the instant bankruptcy action is truly a continuation of the litigation between Schwartz, on the one hand, and Debtors (and Fitzgerald)

---

Further, Judge Messitte stated that "if it found that [Debtors] acted in bad faith in defiance of the orders of [the District of Maryland] and the Fourth Circuit, such conduct would warrant appropriate sanctions against [Debtors]" and that "[r]egrettably, the [District of Maryland] [found] it necessary to reiterate this warning" to Debtors after the quick ultimatum. *Id.* at p. 2 (alterations supplied).

on the other hand. This quintessential two-party dispute has no place in bankruptcy when the parties have litigated for years in the District of Maryland and the Fourth Circuit. Debtors only filed in this District to escape oversight from Judge Messitte's court. *See Klaas v. Shovlin (In re Klaas)*, 858 F.3d 820, 825 (3d Cir. 2017) (quoting 28 U.S.C. § 158(a)) ("District courts have 'jurisdiction to hear appeals ... from final judgments, orders, and decrees ... of bankruptcy judges'") (ellipses in original).

**Factor (m), Subjective intent of the Debtor:** Finally, consideration of Debtors' stated intent and/or reasoning behind its bankruptcy filings here further disproves any good faith basis and further necessitates dismissal. According to Director, Gregg Steinbarth's declaration, the purpose behind Debtors' instant bankruptcy filings was a need to rid itself of "underperforming and non-performing" franchises, and "restructure and right-size" the franchise network. *See* ECF No. 8, ¶ 24. Notably, approximately two months ago, Debtors also made clear in that same declaration that they "intend[ed] to perform their obligations to Schwartz in keeping with their understanding of the orders of the [District of Maryland] and the Fourth Circuit…[.]" *Id.* at ¶ 22 (alterations supplied).

Debtors' actions in the instant bankruptcy action thus far, however, contradict its prior sworn statements to this Court. Specifically, Debtors have recently filed a Motion to Reject Schwartz's franchise. *See* ECF No. 91. Debtors' motion is, of course, diametrically inconsistent with their previously stated intent to honor its obligations to Schwartz, and to keep in compliance with the orders of the District of Maryland, and the Fourth Circuit.

Moreover, Debtors allegation that the purpose of the instant bankruptcy is to get rid of underperforming franchises, in order to increase profitability and "right-size" the system is a sham. *See* ECF No. 8, ¶ 24. As of July 24, 2017, Debtors had 76 "Rent-A-Wreck" franchises

(and an untold additional number of Priceless franchises). Of those 76 franchises, Debtors have asked this Court to terminate just seven (7) Rent-A-Wreck franchises, including, its founder Schwartz.[14] In other words, Debtors' bankruptcies seeks to "right-size" and increase profitability by terminating less than one (1) out of every ten (10) Rent-A-Wreck franchises, and no Priceless franchises. It is great irony that through this bankruptcy (filed weeks after a contempt judgment), Debtors have now deemed that Schwartz is one of the select few franchisees that it can no longer carry after 50 years of so doing. Debtors' decision to attempt to terminate Schwartz's rights is egregious in light of the rulings of the District of Maryland and the Fourth Circuit forbidding that very result. Likewise, Debtors' contention that Schwartz's franchise is underperforming or otherwise unprofitable for it is egregious considering Schwartz is the foundering franchisee, the creator of the Rent-A-Wreck trademark (which Debtors hold in such high value), has lawfully never paid any revenues or fees to Debtors (entities which he created),[15] has never before been considered a "drain on revenues" in the nearly 50 years in which has done business under the Rent-A-Wreck name; and since Debtors have promoted (and still promote) Schwartz on their various social media pages as a "customer service God." *See* screenshot of RAWA's Facebook page from April 2012, attached hereto as Ex. 16, at p. 3 (copying a "great review" about Schwartz's franchise and referring to Schwartz as a "customer service God.");[16] screenshot of RAWA's Twitter page from April 2012, attached hereto as Ex.17, at p. 3 (same);[17] screenshot of

---

[14] *See* ECF No. 91, ¶ 15 (seeking to reject the franchise agreements of Schwartz, Michael Maslen, Howard Brodsky, Damon Lieurance, J. Walter Cahn, Warren Potter/Thomas Clarich, and potentially, Thomas Falco (if Falco does not terminate his franchisee agreement)).

[15] Debtor Bundy received its name due to the fact that Schwartz first operated his rental car business on Bundy Drive in Los Angeles, California.

[16] This document was introduced in the second jury trial between the parties in the Maryland Litigation as Schwartz's Exhibit No. 31.

[17] This document was introduced in the second jury trial between the parties in the Maryland Litigation as Schwartz's Exhibit No. 30.

RAWA's Facebook page taken just recently on September 6, 2017, attached hereto as Ex. 18 (noting that RAWA's Facebook page continues, to this day, to include this positive review for Schwartz's franchise).

Accordingly, for all the aforementioned reasons, this Court should find that Debtors' petition lacks good faith, and must dismiss the instant bankruptcy matter, with prejudice under 11 U.S.C. § 1112(b).

**B.      Alternatively, the Court should dismiss Debtors' bankruptcy petition pursuant to 11 U.S.C. § 305(a).**

According to 11 U.S.C. § 305(a)(1), a bankruptcy case may be dismissed at any time if "the interests of creditors and the debtor would be better served by such dismissal or suspension." Certain factors courts consider when looking at dismissals under 11 U.S.C. § 305(a)(1) include the following:

> (1) the economy and efficiency of administration;
> (2) whether the forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Amc Investors, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (citing *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)).

Notably, dismissal under 11 U.S.C. § 305(a)(1) may also be appropriate in instances where "the bankruptcy case constitutes a two-party dispute between the debtor and a single

creditor." *Id.* at 488. "Courts generally abstain in two-party disputes where relief is available in a non-bankruptcy forum." *Id.* at 488.

For many of the same reasons stated above with respect to 11 U.S.C. § 1112(b), factors (1), (2), (6), and (7) from *In re Amc Investors, LLC* require dismissal under 11 U.S.C. § 305(a)(1).

C.    **Schwartz requests leave to file a motion seeking his attorneys' fees and costs associated with the instant bankruptcy action to the extent this Court grants dismissal here.**

Pursuant to Bankruptcy Rule 9011(c), this Court may grant sanctions, including payment of another's reasonable attorneys' fees and costs, to those who file bankruptcy petitions with an improper purpose.[18] Because such a motion seeking sanctions must be made separately, *see* Fed. R. Bankr. P. 9011(c)(1)(A), Schwartz requests leave to file such a motion should this Court grant the instant Motion to Dismiss.

II.    **Alternatively, should this Court not dismiss Debtors' above-captioned bankruptcy, this Court should transfer this action and any future adversary, ancillary, and/or related matters to the United States Bankruptcy Court for the District of Maryland.**

A.    **Legal standard for transferring venue under 28 U.S.C. § 1412.**

Pursuant to 28 U.S.C. § 1412, a district court "may transfer a case or proceeding under title 11 [11 USCS §§ 101 et seq.] to a district court for another district, in the interest of justice or for the convenience of the parties." (alteration in original). The use of the disjunctive "or" in 28 U.S.C. § 1412 has been noted as making "two distinct analytical bases upon which transfer of

---

[18] Because Schwartz is alleging that Debtors filed the instant bankruptcy action and/or petitions with an improper purpose, the instant request for leave to seek sanctions was not required to be served upon opposing counsel beforehand. *See* Fed. R. Bankr. P. 9011(c)(1)(A) (noting that the requirement to provide opposing counsel with the twenty-one day opportunity to withdraw the bad faith filing "shall not apply if the conduct alleged is the filing of a petition [with an improper purpose]" (alteration supplied).

venue may be grounded." *In re Caesars Entm't Operating, Co.*, Case No. 15-10047 (KG), 2015 Bankr. LEXIS 314, at *16-17 (Bankr. D. Del. Feb. 2, 2015) (citations and quotations omitted).

This Court has previously noted that the interest of justice component of 28 U.S.C. § 1412 is "a broad and flexible standard which must be applied on a case-by-case basis. It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness[.]" *In re Caesars Entm't Operating, Co.*, 2015 Bankr. LEXIS 314, at *23-24 (citations and quotations omitted).

With respect to a transfer of venue founded upon the convenience of parties, this Court has previously followed the factors enumerated by the Fifth Circuit's decision: *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1247 (5th Cir. 1979) ("*CORCO*"). These factors are as follows:

(1) the proximity of creditors of every kind to the Court;
(2) the proximity of the debtor to the Court;
(3) the proximity of the witnesses necessary to the administration of the estate;
(4) the location of the assets; and
(5) the economic administration of the estate.

*In re Caesars Entm't Operating, Co.*, 2015 Bankr. LEXIS 314, at *20 (citing *CORCO*, 596 F.2d at 1247).

In addition to the above *CORCO* factors, since a motion to transfer under 28 U.S.C. § 1412 is comparable to general change of venue statute codified at 28 U.S.C. § 1404(a), bankruptcy courts may consider additional factors, including:

(1) plaintiff's forum choice;
(2) defendant's forum preference;
(3) whether the claim arose elsewhere;
(4) the location of books and records and/or the possibility of viewing the premises if applicable;

(5) the convenience of the parties as indicated by their relative physical and financial condition;

(6) the convenience of the witnesses – but only to the extent that witnesses may actually be unavailable for trial in one of the fora;

(7) the enforceability of the judgment;

(8) the practical considerations that would make the trial easy, expeditious, or inexpensive;

(9) the relative administrative difficulty in the two fora resulting from congestion of the courts' dockets;

(10) the public policies of the fora;

(11) the familiarity of the judge with the applicable state law; and

(12) the local interest in deciding local controversies at home.

*In re Centennial Coal, Inc.*, 282 B.R. 140, 144 (Bankr. D. Del. 2002) ("*Centennial Coal*").

Although 28 U.S.C. § 1412 is disjunctive, Debtors' bankruptcy action should be transferred to the United States Bankruptcy Court for the District of Maryland, Southern Division (located in Greenbelt, Maryland) for **both** the interests of justice and the convenience of parties.

**B.    If Debtors' bankruptcy petitions are not dismissed, all of the *CORCO* factors favor transferring this matter to the United States Bankruptcy Court for the District of Maryland, Southern Division.**

**Factor (1), the proximity of creditors of every kind to the Court:** Only two unsecured creditors in this case, totaling a combined, less-than $5,000 worth of debt, are listed with Delaware addresses.[19] ECF No. 68 at p. 20. Besides that, Delaware's link to the creditors in this action is non-existent, whereas Maryland jurisdiction runs common. JJFMS is the only secured creditor in this case. ECF No. 8, ¶18. JJFMS is a Maryland corporation with a principal place of business in Kensington, Maryland. ECF No. 68 at p. 16. At least two insider, unsecured creditors, including Bundy and MBRC, LLC, are both Maryland limited liability companies, and a handful of other unsecured creditors are listed with Maryland addresses. *Id.* at p. 20.

---

[19] Notably, these two unsecured creditors, each listed as CARDMEMBER SERVICES, Bank of America, were listed in RAWA's Voluntary Petition as having **Texas** addresses. ECF No. 1 at p. 10.

**Factor (2), the proximity of the debtor to the Court:** Debtors only connection to Delaware for purposes of this bankruptcy action is the fact that RAWA. is organized under the laws of the State of Delaware. ECF No. 8, ¶ 1. Besides that fact, **all** facts relating to RAWA suggest Maryland as the more proper venue. RAWA is headquartered in Maryland, hosts its Call Center in Maryland, and has five Maryland franchises. Notably, RAWA has not one franchise located in Delaware and does no business there.

Co-Debtor Bundy is a Maryland limited liability company and has no connection to Delaware (a fact alone that should dismiss Bundy from this Court's jurisdiction). ECF No. 8, ¶ 1.

**Factor (3), the proximity of the witnesses necessary to the administration of the estate:** Any and all relevant witnesses to Debtors' and Schwartz's dispute here would involve individuals who reside in Maryland. Specifically, Gregg Steinbarth and Michael DeLorenzo, each of whom have already filed sworn declarations in this action (ECF Nos. 8 and 10, respectively), are both Maryland residents and work at Debtors' headquarters in Maryland. Mr. Fitzgerald, owner of Debtors and their affiliated entities, is also a Maryland resident. Further, to the extent Schwartz, a California resident, is needed as a witness in this bankruptcy, he has traditionally flown to Maryland to meet with his long-time undersigned Maryland counsel, and therefore would be better suited to attend any proceedings in that jurisdiction.

**Factors (4), the location of the assets, and (5), the economic administration of the estate:** All corporate assets of Debtors are located at their headquarters in Maryland. With all parties having ties to Maryland, the administration of, and litigation surrounding, the estate would prove costly and ineffective in this jurisdiction.

**C.** **If Debtors' bankruptcy petitions are not dismissed, the applicable *Centennial Coal* factors favor transferring this matter to the United States Bankruptcy Court for the District of Maryland, Southern Division.**

**Factor (3), whether the claim arose elsewhere:** Debtors' bankruptcies, if legitimate, arose in Maryland since Debtors are either formed under the laws of Maryland and/or have its principal place of business in Maryland. *See* ECF No. 23. Moreover, Debtors' dispute with Schwartz arose in Maryland and has been litigated in the District of Maryland since June 2007. The District of Maryland is accordingly the most familiar with the parties, their history, and the existing court orders governing their future conduct.

**Factors (5), the convenience of the parties; (6), the convenience of the witnesses; and (8), practical considerations for trial:** As stated above, Debtors' only connection to this venue is that RAWA was organized -- but is not headquartered – in Delaware.

Conversely, Debtors' bankruptcies, if allowed to proceed, should be transferred because all (or the overwhelming majority of) parties, witnesses and evidence is/are located in Maryland. Debtors are both headquartered and have principal places of business in Laurel, Maryland. *See* ECF NO. 23. The majority of Debtors' subsidiary and/or affiliated entities (*i.e.* the insider creditors) are formed under the laws of Maryland and have principal places of business in Mr. Fitzgerald's offices located in Kensington, Maryland. *See* ECF NO. 23-1. Accordingly, all of Debtors' books, records, and documentary evidence is founded at its headquarters located in Maryland.

Moreover, the vast majority of witnesses (*e.g.* officers, directors, members, employees, agents, etc.) are located in Maryland – where Debtors' do business. For example, Mr. Steinbarth (who has repeatedly testified for Debtors in the Maryland Litigation, and has provided sworn statements to this Court) is located in Maryland. Michael DeLorenzo, who has provided sworn

statements to this Court, is located in Maryland. Mr. Fitzgerald lives in Bethesda, Maryland, and his conglomerate of businesses are principally located in Maryland. By contrast, Debtors have no offices or franchises in Delaware, and their longtime, lead counsel are not even located in Delaware.

Put simply, there is no reason for this matter to be tried in Delaware.

**Factors (7), enforceability of the judgment; and (11), the familiarity of the Judge with the applicable law:** With all respect to this Court, a Maryland court, under Judge Messitte's watch, would be best suited to enforce Debtors' compliance with the binding orders of the District of Maryland and the Fourth Circuit. The District of Maryland's familiarity with the parties and their history would promote a more efficient administration of justice in this case.

**Factor (12), local interest in deciding local controversies at home:** As a threshold matter, Debtors' bankruptcy petitions were filed in bad faith. But even if those filing were proper, Debtors' choice to file in Delaware is forum shopping of the most obvious, egregious kind. With the sting of Judge Messitte's contempt sanction and judgment still fresh, Debtors sought to escape an unfriendly judge and venue, and to move their next assault on Schwartz to a new location, unfamiliar with the binding court orders and Debtors' past misconduct.

Respectfully, this Court should take no interest in and should refuse to host this hotly-contested, two-party battle between Schwartz, in one corner, and Fitzgerald and his related entities in the other. The next round of this fight should continue, if at all, in the same ring as the previous rounds – Maryland Federal Court.

## CONCLUSION

For the foregoing reasons, Creditors David S. Schwartz and Rent A Wreck, Inc. respectfully request this Court to enter an order dismissing, with prejudice, Debtors Rent-A-Wreck of America, Inc.'s and Bundy American, LLC's above-captioned bankruptcy action. To the extent this Court grants the instant dismissal request, Creditors David S. Schwartz and Rent A Wreck, Inc. respectfully requests leave to file a motion for his attorneys' fees, under Federal Rule of Bankruptcy Procedure 9011, for RAWA's bad faith filings. In the alternative, Creditors David S. Schwartz and Rent A Wreck, Inc. respectfully request this Court to enter an order transferring Debtors Rent-A-Wreck of America, Inc.'s and Bundy American, LLC's bankruptcy action and any future adversary, ancillary, and/or related matters to the United States Bankruptcy Court for the District of Maryland, Southern Division (located in Greenbelt, Maryland).

Dated: September 25, 2017

/s/ Scott T. Earle
Scott T. Earle, Esq. (DE Bar No. 4541)
Cohen Seglias Pallas Greenhall & Furman PC
1007 North Orange Street
Nemours Building, Suite 1130
Wilmington, Delaware 19801
302-425-5089 (office)
302-691-1452 (fax)
searle@cohenseglias.com
*Co-counsel for Creditors/Plaintiffs*
*David S. Schwartz & Rent A Wreck, Inc.*

-and-

/s/ Roger C. Simmons
Roger C. Simmons, Esq. (admitted *pro hac vice*)
Jacob I. Weddle, Esq. (admitted *pro hac vice*)
Charles E. Remus II, Esq. (admitted *pro hac vice*)
Gordon & Simmons, LLC
1050 Key Parkway, Suite 101
Frederick, Maryland 21702
301-662-9122 (office)
301-698-0392 (fax)

dwise@gordonsimmons.com
*Counsel for Creditors/Plaintiffs*
*David S. Schwartz & Rent A Wreck, Inc.*