## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RENT-A-WRECK OF AMERICA, INC., *et. al.*, | Case No. 17-11592 (LSS) |
| Debtors. | |

### OPINION[1]

In *In re Integrated Telecom Express, Inc.*[2] the Third Circuit theorized and rejected the idea that any entity willing to undergo a bankruptcy proceeding could lawfully take advantage of the redistributive provisions of the United States Bankruptcy Code.  The Court recognized that provisions like the capping of claims, the discharge of debts and avoidance powers can only be used by financially distressed debtors whose goals further the structure and purpose of the Code.  After examining the record in this case under the good faith standard enunciated in this Circuit, I conclude that these bankruptcy cases are concrete examples of the hypothetical cases envisioned by the Third Circuit.  Debtors filed these cases because they could.  These privately-owned debtors are not in financial distress (or at least they have not proven they are), and they seek to use 11 U.S.C. § 365 to redistribute value from a long-time adversary to enrich their ultimate shareholder.  Accordingly, I grant the motion to dismiss these voluntarily filed bankruptcy cases.

---

[1] This Opinion constitutes findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

[2] 384 F.3d 108 (3d Cir. 2004).

## I.    *Background / Corporate Structure*

There are two debtors in these cases: Rent-A-Wreck of America, Inc. ("RAWA"[3])

and its wholly owned subsidiary, Bundy American, LLC ("Bundy," and together with

RAWA, "Debtors"). Bundy is in the business of selling and administering franchises for the

operation of "Rent-A-Wreck" vehicle rental businesses.[4] A "Rent-A-Wreck" franchisee

operates a car rental business for the value minded customer who is comfortable renting an

older model vehicle. As of the filing of the bankruptcy petitions, there were 76 Rent-A-

Wreck franchises in 28 states and the country of St. Maarten as well as a master franchisee

located in Oslo, Norway, which administers sub-franchises in Iceland, Norway and

Sweden.[5] RAWA is described as "principally" a holding company for its operating

subsidiary, Bundy,[6] but it also runs the reservation system for Bundy and for non-debtor

affiliated entities also in the vehicle rental business.[7] RAWA also provides certain

management and backroom services to Bundy and its subsidiaries.[8]

Bundy currently has between four and six wholly owned, non-debtor subsidiaries.[9]

Priceless Rent-A-Car LLC offers vehicle rental franchises under the name of "Priceless" and

---

[3] RAWA does business in the name of International Franchise System. 2017 Franchise Disclosure Document, Schwartz Ex. 51 Bates 000007.

[4] Declaration of Gregg Steinbarth in Support of Chapter 11 Petitions and Requests for First Day Relief, Debtors' Ex. 12 ¶ 8; Schwartz Ex. 33 ¶ 8 ("Steinbarth Decl.").

[5] Steinbarth Decl. at ¶ 8.

[6] *Id.* at ¶ 8.

[7] *Id.* at ¶ 7; Dec. 5, 2017 Trial Day 1 Hr'g Tr. 16.

[8] Steinbarth Decl. at ¶ 7; Trial Day 1 Hr'g Tr. 16.

[9] Upon the commencement of these cases, I requested a corporate organization chart. Debtors prepared a chart, titled "Corporate Organization for JJFMS and the rental car subsidiaries," which was introduced into evidence as Schwartz Ex. 35 ("Corporate Organization Chart"). The Corporate Organization Chart is inconsistent with other evidence, including Debtors' respective schedules (referenced below) and, to some extent, the 2017 Franchise Disclosure Document. Debtors' schedules and the Audited Financials (defined below) appear to be consistent. Notwithstanding inconsistencies, the only information in direct conflict is whether Bundy (as reflected in the Corporate Organization Chart) or RAWA (as reflected in the Schedules) is the parent company of

"NextCar."[10] As of December 12, 2016, there were 35 Priceless franchises and 1 NextCar franchise open and operating in the United States.[11] Consolidated American Rental Insurance Company, LTD offers insurance services to Rent-A-Wreck franchisees, and perhaps others.[12] MBRC, LLC is a company owned Rent-A-Wreck franchise located in Baltimore, Maryland.[13] Embarc Chicago, LLC is no longer in business, but operated a Rent-A-Wreck vehicle rental business at Chicago's Midway airport from November 2011 through November 2015.[14] Rent-A-Wreck Leasing, LLC is described as dormant[15] as is Priceless-Rent-A-Car of Maryland, Inc.[16]

RAWA and Bundy are part of a much larger group of private companies owned by J.J.F. Management Services, Inc. ("JJFMS"). JJFMS is "a management company that oversees the property and operations management of automobile dealerships and vehicle rental facilities throughout the Mid-Atlantic States and Florida."[17] JJFMS's primary principal is John J. Fitzgerald, Jr., who is an owner, president, chief executive officer and chairman of the JJFMS board of directors.[18] He is also a director and the chairman of RAWA's board of directors.[19]

---

Consolidated American Rental Insurance Co. This difference is not material for purposes of this decision.

[10] Schwartz Ex. 51 Bates 000008.

[11] *Id.*

[12] This entity appears to be CAR, Inc. as described in Schwartz Ex. 51 Bates 000008, 000028.

[13] Schwartz Ex. 51 Bates 000008.

[14] *Id.*

[15] Bundy American, LLC Schedules of Assets and Liabilities and Statement of Financial Affairs (Debtors Ex. 14; Schwartz Ex. 38, "Bundy Schedules"), Schedule A/B, Part 4 Question 15.

[16] *Id.* Priceless Rent-A-Car of Maryland, Inc. is either a wholly owned subsidiary of Bundy, *id.*, or of Priceless Rent-A-Car, LLC, Notes to Consolidated Financial Statements July 31, 2016, 2015, 2014, and 2013, Schwartz Ex. 51 Bates 000147.

[17] Schwartz Ex. 51 Bates 000147.

[18] *Id.* at Bates 000011.

[19] *Id.* The Corporate Organization Chart does not disclose that Mr. Fitzgerald is on the board of RAWA. Schwartz Ex. 35.

Mr. Fitzgerald, directly or indirectly, through JJFMS, owns a number of other businesses.[20] For example, one of his entities, All Car Leasing, Inc., trades under the name NextCar All Vehicle Rental, and operates 16 vehicle rental businesses.[21] All Car Leasing and Bundy share, at a minimum, office space and a website, and it would appear that Debtors and various non-debtor entities share some backroom services provided by RAWA.[22] There are intercompany allocations among Debtors and non-debtor entities, but there is no written document memorializing the sharing arrangement.[23] Further, in May, 2017 (shortly before the bankruptcy filing), Bundy sold KFL, LLC to JJFMS for $180,000, which Debtors state exceeded the appraised value of that asset.[24] KFL, LLC leases (or can lease) vehicles to Rent-A-Wreck franchisees, and perhaps others.[25]

---

[20] Trial Day 1 Hr'g Tr. 48–49 ("Your Honor, may remember from our last hearing that we [JJJFS] were already in the rental car business. We have a fleet of 1,700 to 2,000 cars that we run directly in the Baltimore/Washington area in our NextCar brand. And some of the reasons that why Rent-A-Wreck of America was appealing to us is because we were already in the business and we thought we already know a lot about how to run the business, and so we thought we'd integrate it into our already existing business. And that's essentially what we've done. We have Rent-A-Wreck of America, All Car Leasing are the two primary businesses. And, what we do is, we try to achieve some economies of scale, if you will, by having one administrative office and they share it. So what happens is, every month we allocate a certain amount of the rent the overall company pays to each one of these entities. And then sometimes what's happened in the case of Rent-A-Wreck and Bundy, they were always short of cash because of the litigation expenses, so what ended up happening is, they would on a net basis end up having money flow to them more than from the other entities that they had cash so that Rent-A-Wreck of America and Bundy picked on the debtors to pay their legal expenses, and other things too.").

[21] Schwartz Ex. 51, Bates 000008.

[22] Notes to Consolidated Financial Statements July 31, 2016, 2015, 2014, and 2013, Schwartz Ex. 51 Bates 000149.

[23] *Id.* ("The amount of expense allocated to each subsidiary is determined based upon estimated proportions of total hours spent by administrative employees, which management believes to be reasonable. However, RAWA operates *certain other businesses* and provides various services to the Company, including financial, accounting, legal, human resources, and information systems services."). "Company" is defined as Bundy American, LLC and Subsidiaries. *Id.* at Bates 000143.

[24] Trial Day 1 Hr'g Tr. 13; Steinbarth Decl. ¶ 8. There was no testimony regarding how, if at all, Debtors valued the $215,837 debt owed by Debtors to KFL, LLC in the context of this sale. *See infra* Table 2.

[25] Schwartz Ex. 51 Bates 000031, 000150.

4

Each of RAWA's officers and directors (other than Steven Looney who was appointed to the board after the bankruptcy filing) is associated with JJFMS.[26] Bill Cash (director and president) is also an owner of JJFMS.[27] Gregg J. Steinbarth (director and assistant secretary) is a director, the assistant secretary and general counsel of JJFMS.[28] Michael DeLorenzo (director, vice president and secretary) manages All Car Leasing.[29] Ronald Jaffe (treasurer/assistant secretary) is the Chief Financial Officer of JJFMS.[30] And Jason Manelli (vice president of marketing and communications) serves in a marketing capacity for All Car Leasing.[31] Each of these relationships with JJFMS or Mr. Fitzgerald predate JJFMS's acquisition of RAWA.[32]

## II.   *Brief History of Debtors' Litigation with David Schwartz and their Relationship*

JJFMS did not always own RAWA and Bundy.

Rent-A-Wreck began as the baby of David Schwartz, who first started using the name "Bundy Rent-A-Wreck" in 1973 in connection with his auto sales business in Los Angeles.[33] While the history of the business and the Rent-A-Wreck trademark is lengthy, for purposes of this decision it is enough to say that in 1977, Mr. Schwartz and another

---

[26] *Id.* at 000011.

[27] *Id.*

[28] *Id.* at 000012.

[29] *Id.* at 000011.

[30] *Id.* at 000012.

[31] *Id.*

[32] Bundy American, LLC, 2006 Franchise Offering Circular, Schwartz Ex. 47 6, 8–9.

[33] *Schwartz v. Rent A Wreck of Am., Inc.*, 468 Fed.Appx. 238, 241 (4th Cir. 2012) ("*Schwartz I*"). Extensive factual background regarding the history of the Rent-A-Wreck name, RAWA and Bundy is found in *Schwartz I* and *Schwartz v. Rent A Wreck of America, Inc.*, 603 Fed Appx. 142 (4th Cir. 2015) ("*Schwartz II*"), which were issued in connection with litigation between Mr. Schwartz and Debtors in the United States District Court for the District of Maryland in that certain matter styled *David Schwartz v. JJF Management Services, Inc., et al.*, Civil. No. RDB 07-1679 ("Maryland District Court Litigation").

investor created the predecessor to Bundy for the purpose of offering Rent-A-Wreck franchises; the Rent-A-Wreck mark was assigned to Bundy; and the Los Angeles County territory was excepted from the assignment.[34] Years (and many developments) later, Bundy, now a wholly owned subsidiary of then-publically owned RAWA, ran the Rent-A-Wreck franchise system and managed the Rent-A-Wreck mark in all locations except Los Angeles.[35] The relationship between RAWA and Mr. Schwartz was "somewhat unorthodox."[36] There was never a formal, executed franchise agreement, and while RAWA imposed certain requirements upon its franchisees, Mr. Schwartz did not abide by those requirements at his Los Angeles location.[37]

In 2006, JJFMS completed the purchase of all outstanding RAWA stock and took RAWA private.[38] Even before the sale closed, however, Mr. Schwartz filed two lawsuits against RAWA challenging the sale.[39] In October, 2006, RAWA (now owned by JJFMS) wrote Mr. Schwartz demanding that he either provide evidence of a franchise agreement or that he stop holding himself out as a RAWA franchisee.[40] RAWA later removed the Los Angeles location from its website.[41]

On June 25, 2007, Mr. Schwartz sued RAWA, Bundy and JJFMS commencing the Maryland District Court Litigation presided over by the Honorable Peter J. Messitte.[42] Mr.

---

[34] *Schwartz I*, 468 F. App'x at 241.
[35] *Id.*
[36] *Id.* at 242.
[37] *Id.*
[38] *Id.*
[39] *Id.* Mr. Schwartz was ultimately unsuccessful in these lawsuits.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 242-3. Mr. Schwartz's entity, Rent-A-Wreck Incorporated ("RAWI"), was also a plaintiff in that suit. For ease of reference, I will simply refer to Mr. Schwartz in this opinion.

Schwartz sought a declaratory judgment that he had a royalty-free Rent-A-Wreck franchise pursuant to a 1985 agreement between himself, RAWA and Bundy as well as specific performance of that agreement.[43] Alternatively, Mr. Schwartz contended that he had an implied-in-fact contract based on a course of conduct between 1977 and 2007.[44] RAWA and Bundy asserted counterclaims, including a request for a declaration that any franchise agreement could be terminated or that any exclusive franchise agreement was an unlawful restraint on trade.[45]

After two jury trials, motions for judgment notwithstanding the verdict, and two Fourth Circuit decisions, it has been determined that Mr. Schwartz has an implied-in-fact royalty and fee-free franchise agreement to run a Rent-A-Wreck used car rental business in West Los Angeles for his lifetime. The exact terms of the implied franchise agreement are undetermined.[46] Mr. Schwartz does not need to comply with RAWA's fleet requirements.[47] RAWA must keep the Los Angeles location on its website.[48] And, an order in the Maryland District Court Litigation provides: "[RAWA's] Call Center shall in no way attempt to dissuade prospective customers from connecting with [Mr. Schwartz's] business or in any way attempt to divert business from Plaintiffs' exclusive business territory to other

---

[43] *Id.* at 243.
[44] *Id.*
[45] *Id.*
[46] The provision of a January 23, 2013 Order that Schwartz and RAWA "ARE SUBJECT to the terms and provision in the 2011 Rent-A-Wreck Franchise Agreement, attached hereto, with the exceptions noted in the accompanying Memorandum Opinion" was later suspended. Feb. 28, 2013 Memorandum Order, Schwartz Ex. 18.
[47] Schwartz Ex. 18.
[48] *Id.*

franchises."[49] But, otherwise, the obligations of the parties to each other are unsettled.[50] In its March 10, 2015 Opinion upholding the District Court's judgment after the second jury verdict, the Fourth Circuit states: "the jury found that RAWA could exercise *some* control over Schwartz, but neither the jury nor the district court defined the contours of that control. . . . If the parties continue to disagree over how much control RAWA can exercise over Schwartz, they are free to resolve that disagreement through, for example, private negotiations or a state-law breach-of-contract action."[51]

Since *Schwartz II*, the interactions between the parties remain strained. Mr. Schwartz does not participate in required RAWA programs or non-required, authorized programs. He does not participate in focus groups with other employees and has "unsubscribed" from RAWA emails. Mr. Schwartz has three of his own websites that are not linked to the RAWA website and RAWA believes that Mr. Schwartz is not using RAWA's web-based reservation system.[52]

For its part, RAWA only protracted the litigation. For example, the Clerk of the Maryland District Court taxed certain costs of the Schwartz litigation to RAWA, but RAWA did not pay those costs until Judge Messitte inquired into the matter in open court.[53]

---

[49] Order, Mar. 4, 2011, Schwartz Ex. 15.
[50] On remand, and prior to the second jury trial, it is fair to say that Judge Messitte implored the parties to resolve the open issues and scheduled a hearing for September 16, 2013 to consider "the contested obligations one by one." *See* Schwartz Ex. 18. The parties did not take Judge Messitte up on his offer, apparently preferring to leave their respective obligations up in the air. *See* Memorandum Order, July 19, 2013, Maryland District Court Litigation ECF No. 499; Memorandum Order, Aug. 15, 2013, Maryland District Court Litigation ECF No. 504; Final Order of Judgment on Remand, Aug. 23, 2013, Maryland District Court Litigation ECF No. 507.
[51] *Schwartz II*, 603 F. App'x at 145 n.2.
[52] Trial Day 1 Hr'g Tr. 36, 38.
[53] As Judge Messitte wrote: "At the September 30, 2016 hearing, after the Court inquired as to the matter, counsel for RAWA handed Schwartz' counsel a check for $13,405.11 to cover the court-ordered costs. The fact that RAWA waited until the filing of Schwartz's Motion and the day of the

Further, Judge Messitte found that in April 2016, RAWA intentionally diverted prospective customers from Mr. Schwartz's business when RAWA's call center told prospective customers that there was no Rent-A-Wreck franchise in West Los Angeles.[54] This conduct served as the basis for finding RAWA in contempt of Judge Messitte's March 2, 2011 Order, which he described as "not a declaratory judgment as asserted by RAWA" but an order that "explicitly and coercively directed RAWA to refrain from certain actions."[55] In his contempt ruling, Judge Messitte also ordered further injunctive relief "in light of RAWA's consistent efforts to undermine Schwartz's business." He again ordered RAWA to publish Mr. Schwartz's contact information on the RAWA website, and further ordered RAWA to employ a specific pre-recorded dialogue for all incoming calls to its call center, with a specific message related to the Los Angeles franchise.[56]

---

hearing to make the tender was yet another indication of RAWA's apparent strategy, proclaimed at the outset by RAWA's principal operative, Jack Fitzgerald, to make Schwartz sweat at virtually every stage of the proceedings." June 29, 2017 Memorandum Opinion, Schwartz Ex. 26, 2 n.2.

[54] In rejecting RAWA's argument that any call center errors were inadvertent, Judge Messitte recalls other instances in which RAWA intentionally caused harm to Schwartz. In the call center instance, he found that the misstatements were "an intentional scheme devised by RAWA based on the fact that those employees' statements to customers appear to have come from a pre-written, uniform script." *Id.* at 7–8 n.5–7.

[55] *Id.* at 4 n.4. *See* Schwartz Ex. 15, ¶4.

[56] Judge Messitte dictated the necessary message:
    RAWA shall employ a pre-recorded dialogue for all incoming calls to its call center.
        The pre-recorded dialogue must substantially be as follows:
        "Thank You for calling, the Rent-A-Wreck Customer Care Center. This call may be monitored and recorded for quality assurance and training purposes. For information regarding cities served by our location in the Greater Los Angeles, California area, please press 1. For information about all other location, please press 2."
        Upon pressing 1 the caller will hear the following message: "Please press 1 for Greater Los Angeles, California area telephone number. Please press 2 for the Greater Los Angeles, California area street address. Please press 3 for the Greater Los Angeles, California area business hours. Please press 4 for the Greater Los Angeles, California email address."
        Upon pressing 1, the caller will hear the following message on a continuous loop until the caller presses 1 or hangs up: "The phone number is 310-826-7555, 310-826-7555. Please press 1 to return to the previous menu".

Further, testimony in this matter shows that in April, 2016, RAWA hired a "mystery shopper" to visit Mr. Schwartz's location.[57]  Given the animosity between the parties and because RAWA has never before hired a mystery shopper,[58] it is fair to infer from the testimony that RAWA hoped the mystery shopper would report a sub-par experience and provide some further basis to attempt to oust Mr. Schwartz from the Los Angeles territory. The conduct is consistent with Judge Messitte's observation that RAWA's "apparent strategy, proclaimed at the outset by RAWA's principal operative, Jack Fitzgerald, [is] to make Mr. Schwartz sweat at virtually every stage of the [Maryland] proceedings."[59] Prepetition, Mr. Fitzgerald spent in excess of $2.7 million in that pursuit.[60]

---

Upon pressing 2, the caller will hear the following message on a, continuous loop until the caller presses 1 or hangs up: The address is 2270 South Centinela Avenue, Los Angeles, California 90064.  Please press 1 to return to previous menu".

Upon pressing 3, the caller will hear the following message on a continuous loop until the caller presses 1 or hangs up: "The business hours are: Monday thru Friday 9:00 a.m. to 6:00 p.m. Pacific Time, Saturday 9:00 a.m. to 4:00 p.m. Pacific Time, Sunday 10:00 a.m. to 1:00 p.m. Pacific Time.  Please press 1 to return to previous menu."

Upon pressing 4, the caller will hear the following message on a continuous loop until the caller presses 1 or hangs up: "The email address is w-r-e-n-t-w-r-e-c-k@aol.com.  W-rent-wreck@aol.com.  Please press 1 to return to previous menu."

If any of the information in the pre-recorded dialogue requires amendment at any time in the future, Schwartz shall contact RAWA, and RAWA shall update the recording without delay.

Final Order of Judgment, Schwartz Ex. 27, ¶ 4.
[57] Trial Day 1 Hr'g Tr. 141–145, 202–205.  April 28, 2016 email from Jason Manelli, Schwartz Ex. 58 (admitted for purposes of showing that RAWA hired mystery shopper to mystery shop at Schwartz location, but not for truth of the contents of the report).
[58] Trial Day 1 Hr'g Tr. 202.
[59] June 29, 2017 Memorandum Opinion, Schwartz Ex. 26 2 n.2.
[60] Steinbarth Decl. at ¶ 22; Schwartz Ex. 29.

### III.    *Bankruptcy Filing*

On July 24, 2017, approximately one month after Judge Messitte held RAWA in contempt, Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code. On September 1, 2017, Debtors filed their motion to reject ("Motion to Reject") certain executory contracts by which Debtors sought to reject seven franchise agreements, including its agreement with Mr. Schwartz.[61]

On September 25, 2017, Mr. Schwartz filed his objection to the Motion to Reject[62] as well as a motion to dismiss ("Motion to Dismiss") the bankruptcy cases.[63] After I ruled on certain Bankruptcy Rule 2004 requests, I set a date for an evidentiary hearing on the two motions. At Mr. Schwartz's request, I determined to rule first on the Motion to Dismiss and to only rule on the Motion to Reject if the cases remained pending (and in this court).

The evidentiary hearing was held on December 5 and 6, 2017, at which time Debtors presented three witnesses: Mr. Steinbarth, Mr. Manelli and Mr. Looney. I also heard argument on the Motion to Dismiss and took the matter under advisement.[64] While under advisement, Debtors requested the opportunity to make a post-trial submission,[65] which Mr.

---

[61] Debtors Motion for Entry of an Order (A) Authorizing and Approving the Rejection of Certain Executory Contracts Pursuant to Bankruptcy Code § 365 and (B) Approving Procedures for Rejection of Other Executory Contracts, ECF No. 91.

[62] Response in Opposition to Debtors Motion to Reject Certain Executory Contracts, ECF No. 114.

[63] Motion to Dismiss Above-Captioned Bankruptcy Action, or Alternatively, to Transfer Venue, ECF No. 116.

[64] During the trial, Mr. Schwartz asked for the opportunity to submit a transcript from the Maryland District Court Litigation, which he contended would impeach certain of Mr. Steinbarth's testimony. That request was granted. While a portion of the transcript was submitted, the remainder has not. Letter from Roger C. Simmons, Gordon & Simmons, LLC, to the Honorable Laurie Selber Silverstein, United States Bankruptcy Court, District of Delaware (Dec. 7, 2017) (on file with chambers; this letter does not appear on the docket). Debtors asked that the partial transcript be stricken. Letter to Honorable Laurie Selber Silverstein, Dec. 8, 2017, ECF No. 181. I have not relied on the partial transcript. Given the outcome of the Motion to Dismiss, it is not necessary to await the final portion of the transcript before ruling.

[65] Letter to Honorable Laurie Selber Silverstein, Dec. 20, 2017, ECF No. 197.

Schwartz neither supported nor opposed.[66] The request was granted, and on January 2,

2017, the parties filed their post-trial submissions.[67]

## IV.    *The Parties' Positions*

Mr. Schwartz's position is that the cases should be dismissed because the bankruptcy

filings are just a continuation of the Maryland District Court Litigation. Mr. Schwartz

asserts that Debtors are simply attempting to do in this court what they could not do in the

Maryland Court—namely take away Mr. Schwartz's exclusive territory so that Bundy can

market franchises in Los Angeles. Mr. Schwartz asserts that the bankruptcy filing, including

the rejection of other franchise agreements, is merely a pretext to obtain the Los Angeles

territory and that this is really just a two-party dispute. Further, Mr. Schwartz contends that

Debtors are not in financial distress, or at least not in any distress that is not of their own

making. Mr. Schwartz contends that attorneys' fees associated with the Maryland District

Court Litigation can stop whenever Debtors (and Mr. Fitzgerald) stop violating court orders

and start respecting Mr. Schwartz's exclusive territory.  He also generally asserts that

Debtors enter this Court with unclean hands.

Debtors contend that they filed for bankruptcy protection to maximize the value of

the Rent-A-Wreck trademark, to reject burdensome franchise agreements, and to relieve

Debtors' balance sheet of significant debt, all of which Debtors posit constitute valid

reorganizational purposes. Debtors argue that by rejecting burdensome franchise

agreements, including in particular Mr. Schwartz's royalty-free, exclusive agreement, they

are both eliminating the risk of continuing litigation expense and opening Mr. Schwartz's

---

[66] Letter to Honorable Laurie Selber Silverstein, Dec. 21, 2017, ECF No. 198.
[67] Debtors' Post-Trial Brief, Jan. 2, 2018, ECF No. 197; Schwartz's Supplemental Brief, Jan. 2, 2018, ECF No. 196.

exclusive Los Angeles territory to new royalty-paying franchisees. Debtors further argue that the case would still have been filed in good faith even if the sole motive behind the bankruptcies was to reject Mr. Schwartz's franchise agreement because it is not bad faith to file a bankruptcy case to make use of specific powers the Bankruptcy Code confers on debtors. Debtors reject Mr. Schwartz's position that these bankruptcies are a mere continuation of the Maryland District Court Litigation noting that it had come to a close prepetition and that there is no tactical advantage to be gained by filing now.

## V.    *Discussion*

A chapter 11 bankruptcy case may be dismissed for cause.[68] Recognizing the equitable nature of bankruptcy and the purposes underpinning chapter 11, the Court of Appeals for the Third Circuit has held that §1112(b) imposes a good faith standard.[69] The concept of good faith has strong roots in equity, and bankruptcy courts patrol the line between "accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy."[70] "A good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . . available only to those debtors and creditors with clean hands."[71]

---

[68] 11 U.S.C. §1112(b).

[69] *In re SGL Carbon Corp.*, 200 F.3d 154, 160–62 (3d Cir. 1999).

[70] *Id.* at 161 (quoting *In re Victory Construction Co., Inc.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981) *order stayed Hadley v. Victory Construction Co., Inc. (In re Victory Construction Co., Inc.)*, 9 B.R. 570 (Bankr. C.D. Cal. 1981)).

[71] *Id.* (quoting *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)).

When a motion to dismiss a bankruptcy case is filed, the burden is on the bankruptcy petitioner to establish that good faith exists.[72] Whether the bankruptcy petitioner has met its burden is a fact intensive question in which courts examine the totality of the circumstances "to see where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive."[73]

There is no definitive list of factors relevant to a good faith determination.[74] The Third Circuit focuses on two inquiries "particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g. by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed to obtain a tactical advantage."[75] The Third Circuit explains:

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code. *Id.* at 165-66. Likewise, "because filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter 11 petitions under these circumstances as well." *Id.* at 165 (quoting *In re Marsch*, 36 F.3d at 828); *see also Furness v. Lilienfield,* 35 B.R. 1006, 1013 (D.Md.1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").[76]

---

[72] *Id.* at 162 n.10; *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith.").

[73] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (citing *SGL Carbon*, 200 F.3d at 162).

[74] *In re 15375 Memorial Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 n.8 (3d Cir. 2009) (quoting *SGL Carbon*, 200 F.3d at 165).

[75] *Integrated Telecom*, 384 F.3d at 119–20.

[76] *Id.* at 120 (quoting *SGL Carbon*, 200 F.3d at 165–66).

14

As the Third Circuit has made clear, a debtor's desire to invoke the powers conferred by the Bankruptcy Code does not establish good faith, nor does it constitute a valid bankruptcy purpose.[77] While the desire to use provisions of the Bankruptcy Code to one's advantage does not constitute a bad faith filing, it also does not constitute a good faith filing.[78] If it did, any entity willing to bear the cost of a bankruptcy filing could use the Bankruptcy Code's redistributive mechanisms to its advantage, a concept "antithetical to the structure and purposes of the Bankruptcy Code."[79] The ability to use the redistributive provisions of the Bankruptcy Code assumes the existence of a valid bankruptcy, "which, in turn, assumes a debtor in financial distress."[80] Thus, good faith is a predicate to a debtor's ability to use provisions of the Bankruptcy Code, and financial distress is a part of—if not itself a predicate to—a good faith analysis. Here, Mr. Schwartz challenges Debtors' good faith, including their financial distress. Debtors, therefore, have the burden to prove by a preponderance of the evidence that their cases were filed in good faith, including that they are in financial distress.[81]

---

[77] *Id.* at 128 ("Although the Bankruptcy Code contains many provisions that have the effect of redistributing value from one interest group to another, these redistributions are not the Code's *purpose*.").

[78] *Id.* at 127–28 ("The far more relevant question is whether a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone, establishes *good* faith. We hold it does not. Just as a desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law. Given the truism that every bankruptcy petition seeks some advantage offered in the Code, any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings."

[79] *Id.* at 129.

[80] *Id.* at 128.

[81] Because I conclude that the record does not establish either financial distress or another basis for good faith, I need not decide whether financial distress (when challenged) is a necessary element of good faith or simply one part of the totality of the circumstances analysis.

### A. *The record does not demonstrate that Debtors were in financial distress at the time the bankruptcy petitions were filed.*

An analysis of financial distress is a fact specific inquiry. Courts consider such factors as: solvency;[82] cash reserves;[83] recent financial performance and profitability;[84] the proportion of debt owed to insiders;[85] realistic estimates of actual or likely liability;[86] the threat of litigation;[87] whether a debt is fixed, substantial, and imminent;[88] current cash position or current liquidity;[89] ability to raise capital;[90] and overdue debts or the ability to pay debts as they come due.[91] Any given case may touch on one or more of these factors.

As became readily apparent during the evidentiary hearing, Debtors did not believe that they had to prove financial distress as an element of good faith. Rather, Debtors believed that all they had to show was that they had a valid reorganizational purpose.[92] As

---

[82]  *Id.* at 124; *SGL Carbon*, 200 F.3d at 163–64; *In re Derma Pen, LLC*, No. 14-11894 (KJC), 2014 WL 7269762, *8 (Bankr. D. Del. Dec. 19, 2014); *Laural Highlands Found., Inc. v. Frankenstein et al.* (*In re Laurel Highlands Found., Inc.*), 473 B.R. 641, 657 (Bankr. W.D. Pa. 2012); *In re Gen. Growth Properties, Inc.*, 409 B.R. 43, 61–62 (Bankr. S.D.N.Y. 2009); *In re Liberate Techs.*, 314 B.R. 206, 211–12, 218 (Bankr. N.D. Cal. 2004).

[83]  *Integrated Telecom*, 384 F.3d at 123–24; *SGL Carbon*, 200 F.3d at 163.

[84]  *Integrated Telecom*, 384 F.3d at 122; *Laurel*, 473 B.R. at 657; *Gen. Growth*, 409 B.R. at 55; *Liberte*, 314 B.R. at 209, 214–15; *In re Alta+Cast, LLC*, No. 02-12982(MFW), 2004 WL 484881 at *3 (Bankr. D. Del. Mar. 2, 2004).

[85]  *SGL Carbon*, 200 F.3d at 163; *Derma Pen*, 2014 WL 7269762 at *9; *Alta+Cast*, 2004 WL 484881 at *3.

[86]  *Integrated Telecom*, 384 F.3d at 124; *SGL Carbon*, 200 F.3d at 163; *Liberate*, 314 B.R. at 213.

[87]  *Integrated Telecom*, 384 F.3d at 125; *SGL Carbon*, 200 F.3d at 162, 167–68.

[88]  *SGL Carbon*, 200 F.3d at 164; *General Growth*, 409 B.R. at 54–55, 62; *Liberate*, 314 B.R. at 213–14.

[89]  *Integrated Telecom*, 384 F.3d at 123–24; *SGL Carbon*, 200 F.3d at 163; *Laurel*, 473 B.R. at 657; *General Growth*, 409 B.R. at 53–54; *Liberate*, 314 B.R. at 210; *Alta+Cast*, 2004 WL 484881 at *3.

[90]  *General Growth*, 409 B.R. at 53–54; *Alta+Cast*, 2004 WL 484881 at *3.

[91]  *SGL Carbon*, 200 F.3d at 166; *Derma Pen*, 2014 WL 7269762 at *9; *Laurel*, 473 B.R. at 657; *General Growth*, 409 B.R. at 57–58.

[92]  *See e.g.*, Trial Day 1 Hr'g Tr. 123–25:
BY MR. SIMMONS (on cross examination):
Q.    In your morning testimony, Mr. Steinbarth, you testified words to the effect that as a franchise company, Bundy's asset is its trademark. You went on to say, If your don't own the marks, then you own nothing. Do you remember that testimony?
A.    Yes.

such, the testimony of both Mr. Steinbarth and Mr. Looney was high-level and conclusory,

leaving many questions unanswered regarding Debtors' financial condition.  Further, as

shown below, in reviewing the exhibits post-hearing, it was difficult to reconcile the

documentary evidence submitted by the parties with the testimony.

---

Q.     Yet, your primary asset, your mark, in your own words is your primary asset, has not been valued in your schedules.

A.     Not yet, that's correct.

Q.     Do you ask the Court to rely upon those schedules to make a finding on whether you're in financial stress?

A.     I'm not sure.

Q.     What else do you ask the Court –

A.     I don't understand the question.

Q.     What do you ask the Court to look at in that regard?

       MS. FEINSTEIN: Objection.  That mischaracterizes our position.  We're not asking Your Honor to find that we are in financial distress as a basis for not dismissing the case, of keeping the case.

       THE COURT: Okay.

       MS. FEINSTEIN: The issue is, do we have a reorganizational purpose.  I guess I'm going to ask him to restate the question so I don't get myself in a tizzy.  He's making an assumption that we're asking the Judge to rely on the schedules, and I want to make sure I understood that that's what he's asking Your Honor to do because that's what he's asking the witness.  So, can you rephrase the question, and I apologize for the confusion.

       MR. SIMMONS: I don't know what I'm saying wrong.  I'll try to redo it.

BY MR. SIMMONS:

Q.     Mr. Steinbarth, you filed an affidavit in this case which you understand your counsel shows that RAWA and Bundy are both in financial distress; correct?

A.     Well, I think what my declaration says is that we weren't claiming to be insolvent as the reason for the bankruptcy.

Q.     You are claiming to be insolvent?

A.     No, I said we were not claiming that as the justification for the bankruptcy solely.

Q.     Thank you, I misheard you. So, why are you here?

A.     We want to take advantage of all the benefits that the Bankruptcy Code provide us.

Q.     On what basis?

A.     It's the law.

Q.     Are you saying any company, no matter what it's [sic] financial condition, can come in and use the Bankruptcy Court to walk away from a contract?

A.     No.

Q.     What are you saying about your financial condition that makes you eligible for bankruptcy, the extreme bankruptcy remedies?

A.     I mean, I don't know that I have an answer for that.

Q.     Okay.

A.     I mean, the schedules say what our financial condition was as of July 24th.

Certain things are clear, however. First, Debtors did not file their cases because they are insolvent. Mr. Steinbarth testified that insolvency played no part in the filing of these bankruptcy cases as Debtors do not claim to be insolvent.[93] Beyond that, while each of Debtors' Schedules reflect liabilities greater than assets, Bundy's Schedules do not reflect a value for its most significant assets, namely its trademarks. In its Schedules, Bundy lists the value of the Rent-A-Wreck trademark (and its other registered trademarks) as "unknown."[94] When questioned, Mr. Steinbarth testified that RAWA did not taken a position on the value of the trademarks at the time the Schedules were filed; neither did he testify to a value at the hearing.[95] Similarly, Bundy's Schedules list the value of Bundy's wholly owned subsidiaries as "unknown."[96] And Mr. Steinbarth did not place a value on the subsidiaries during his testimony.[97] Because Debtors do not take the position that they are insolvent, and because they did not provide evidence on the value of their most significant assets, for purposes of this analysis, I treat Debtors as solvent.

Second, Debtors did not file their bankruptcy cases because of their unsecured debt. Mr. Steinbarth specifically testified that the unsecured debt did not drive the decision.[98] There was no testimony that any creditors—unsecured or otherwise—were hounding Debtors for payment or otherwise dismantling Debtors through a proverbial "race to the

---

[93] Trial Day 1 Hr'g Tr. 124.

[94] Bundy Schedules, Debtors Ex. 14; Schwartz Ex. 38, Schedule A/B, Part 10, Question 60.

[95] Trial Day 1 Hr'g Tr. 73–74.

[96] Bundy Schedules, Debtors Ex. 14; Schwartz Ex. 38, Schedule A/B. Further, the Global Notes Regarding Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs contain multiple disclaimers with respect to the accuracy and the presentation of information in the Schedules, including values ascribed to assets, which makes reliance on the Schedules, without further explanation, questionable.

[97] *See, e.g.*, Trial Day 1 Hr'g Tr. 78–80.

[98] *Id.* at 62 ("Q: Did the unsecured debt drive the decision to file the cases? A: No.")

courthouse." There was no testimony that Debtors were not paying their operational debts as they came due.

Third, as for secured debt, while fixed and perhaps substantial relative to the size of the company,[99] it can hardly be labeled "imminent." The evidence is that Debtors' only outstanding secured debt is owed to JJFMS.[100] As of the Petition Date, RAWA owes JJFMS $2,971,967.47 under a certain Promissory Note dated March 31, 2006.[101] Bundy guaranteed payment of the debt[102] and non-debtors Priceless Rent-A-Car, LLC and Rent-A-Wreck Leasing LLC are also co-debtors on this debt.[103] The debt was not borrowed to satisfy RAWA's operational or other needs. Rather, it was borrowed to pay the legal (and other) expenses surrounding JJFMS's acquisition of RAWA and to purchase the outstanding common and preferred stock held by RAWA's then-equity holders in order to take the company private.[104] The Promissory Note matured on March 31, 2011. In the six years since maturity, no extensions of the maturity date have been granted, nor has a default

---

[99] *Id.* at 220. Mr. Looney also testified that he "had no reason to doubt the validity of that then-existing debt structure," but he did not testify as to any investigation he had done into the debt structure.

[100] Joint Pretrial Order, Ex. A, Statement of Uncontested Facts ¶ 11, Nov. 29, 2017, ECF No. 176. The findings regarding Debtors' outstanding debt were not challenged in connection with the instant motions. As I do not know whether others can or will challenge all or any portion of the debt, these findings are made solely for purposes of the motions under consideration.

[101] Bundy Schedules, Debtors Ex. 14; Schwartz Ex. 38, Schedule D. Rent-A-Wreck of America, Inc., Schedules of Assets and Liabilities and Statement of Financial Affairs (Debtors Ex. 13; Schwartz Ex. 36, "RAWA Schedules"), Schedule D. *See* Promissory Note, Debtors Ex. 18. This debt is secured by security interests in all of RAWA's personal property, tangible and intangible, including RAWA's 100% ownership interest in Bundy and the names "Rent-A-Wreck" and "Rent-A-Wreck of America." Steinbarth Decl. ¶ 15.

[102] Bundy Guaranty Agreement, Debtors Ex. 19. The agreement is also dated March 31, 2006.

[103] RAWA Schedules, Debtors Ex. 13; Schwartz Ex. 36, Schedule H.

[104] Steinbarth Decl. ¶ 15.

been declared.[105] Further, there was no testimony of any collection action taken by JJFMS prepetition or whether there had been any prepetition attempt to refinance this debt.

Fourth, on an order of magnitude, the Schedules reflect significant debt to affiliated entities, and comparatively insignificant debt to unaffiliated entities.[106] The following tables reflect the debt as listed in the Schedules.

## Table 1. Total Secured and Unsecured Debt:

|  | RAWA | BUNDY | COMBINED |
|---|---|---|---|
| Secured Debt owed to JJFMS | $2,971,967.47 | $2,971,967.47 | $2,971,967.47[107] |
|  |  |  |  |
| Unsecured Debt | $3,959,427.75 | $827,525.58 | $4,703,332.53[108] |

## Table 2. Unsecured Debt by Debt Holder:

|  | RAWA | BUNDY | COMBINED |
|---|---|---|---|
| OWED TO: |  |  |  |
| Subsidiaries | $3,715,883.00 | $423,470.00[109] | $4,139,353.00 |
| JJFMS |  | $13,592.24 | $13,592.24 |
| KFL, LLC[110] | $108,295.00 | $107,542.00 | $215,837.00 |
| All Car Leasing | $3,292.04 | $143,318.00 | $146,610.04 |
| Mr. Schwartz | $83,620.80 | $83,620.80 | $83,620.80 |
| **Unrelated Entities** | **$48,336.91** | **$55,982.54** | **$104,319.45** |

---

[105] Trial Day 1 Hr'g Tr. 129. Bundy's guaranty of the RAWA's obligation on the Promissory Note does not appear to be reflected anywhere in Bundy's Financial Disclosure Document notwithstanding the significant discussion of JJFMS and its affiliated entities. The Independent Auditors' Report for Bundy and its subsidiaries states that Bundy's consolidated financial statements for the years ending July 31, 2016, 2015, 2014 and 2013 "present fairly, in all material respects" Bundy's financial position and the results of its operations and its cash flows in accordance with GAAP. Schwartz Ex. 51, Bates 000143. I recognize that a guaranty may not be reflected on consolidated balance sheets, but this obligation, which was a guarantee of payment, not collection, matured in 2011 and there is no mention of the guaranty in the Notes to Consolidated Financial Statements.

[106] RAWA Schedules, Debtors Ex. 13, Schwartz Ex. 36, Schedules D, E/F; Bundy Schedules, Debtors Ex. 14; Schwartz Ex. 38, Schedules D, E/F.

[107] In the combined totals, the secured debt is counted only once.

[108] In the combined totals, Mr. Schwartz's debt is counted only once.

[109] If Consolidated American Rental, Inc. is a subsidiary of RAWA, and not Bundy, *see supra* n.9, then the amount owed to subsidiaries is $385,738, and there is additional affiliate debt of $37,732.

[110] KFL, LLC was a Bundy subsidiary until May, 2017 when Bundy sold it to JJFMS for $180,000.00. Trial Day 1 Hr'g Tr. 13; Steinbarth Decl. ¶ 8.

The lack of significant unaffiliated debt is consistent with the Claims Register Report filed

on the docket on January 8, 2018, which reflects the filing of seven proofs of claim totaling

less than $20,000.[111]

Fifth, Debtors did not provide specific evidence of either Debtor's current cash

position or liquidity. But, Debtors' main assets are their trademarks, which are not liquid.

Debtors also failed to provide specific evidence of their recent financial performance or

current profitability. If anything, they relied on evidence of their net operating losses to

justify the bankruptcy filing. Mr. Steinbarth testified that as of its 2015 tax year, RAWA

had net operating losses of $4.36 million.[112] Much of the net losses are historical. Some

losses predate the 2006 acquisition and $2.7 million of the losses are legal expenses incurred

in the Maryland District Court Litigation.[113] No testimony was offered as to the remainder

of the losses, or whether the losses were generated from RAWA, Bundy, or one of Bundy's

direct or indirect subsidiaries whose losses would flow to RAWA. Other than the

Schedules, Debtors did not offer any unconsolidated financial information for RAWA,

Bundy or any of Bundy's subsidiaries.[114]

Sixth, Debtors did not analyze their current ability to pay their debts as they came

due prior to filing their bankruptcy cases.[115] When asked on direct examination "would the

---

[111] Claims Register Report, Jan. 8, 2018, ECF No. 198. The general bar date was November 21, 2017 and the government bar date was January 22, 2018.

[112] Steinbarth Decl. ¶ 19; Trial Day 1 Hr'g Tr. 45. There was no explanation as to why a more current number was not provided.

[113] Trial Day 1 Hr'g Tr. 168–9.

[114] In Debtors' Post-Trial Brief, they seek to submit evidence of their initial Periodic Report of Debtors Pursuant to Fed. R. Bankr. P. 2015.3, filed on August 22, 2017 which purports to show Debtors' operating subsidiaries net losses for the proposition that the subsidiaries have no cash that would upstream to Debtors. I will not entertain this new evidence, which was available at the time of the hearing, but not presented.

[115] *Id.* at 49.

debtors have been able to pay their debts as they came due without these advances from their affiliates?" Mr. Steinbarth's immediate response was: "We haven't analyzed that, run it to ground. . . ."[116] Recognizing this might not be the hoped-for answer, Mr. Steinbarth then hastened to add that "he does not think there's any way they could." His latter statement, however, was based on the past expenditures on legal fees related to the Maryland District Court Litigation, not current expenses, legal or otherwise.[117]

Mr. Steinbarth's testimony also suggested that RAWA and Bundy were/are always on the receiving end of intercompany loans. For example, he testified that there are end-of-month allocations among all JJFMS companies (for rent, and presumably backroom operations), and that on a net basis RAWA and Bundy need to borrow funds to pay these expenses.[118] However, Bundy's Audited Consolidated Balance Sheets for the years ended July 31, 2016, 2015, 2014 and 2013 ("Audited Financials")[119] suggest that Bundy is not always a net debtor, at least with respect to JJFMS entities.[120] The Audited Financials confirm that there are various arrangements between RAWA, Bundy and Bundy's wholly owned subsidiaries (Bundy, and its wholly owned subsidiaries defined as "the Company"), on the one hand, and other JJFMS entities on the other hand. They further show the

---

[116] *Id.* The transcript reads: "We haven't analyzed that when it's a ground." I took particular note of this response when given. As the transcript did not reflect my note, I listened to the audio to ensure that I noted the accurate response.

[117] *Id.* (Debtors "did not have an extra $2.7 million of cash that they generated from their business operations.").

[118] *Id.*

[119] Schwartz Ex. 51, Bates 000144. I would have greatly benefited from an explanation of the Audited Financials.

[120] The Company is defined as Bundy American, LLC and each of its wholly owned subsidiaries, MBRC, LLC, Priceless Rent-A-Car, LLC, Rent-A-Wreck Leasing, LLC, Embarc Chicago, LLC KFL, LLC and Priceless Rent-A-Car of Maryland, LLC. The audit notes also reflect that all material intercompany balances and transactions among these entities have been eliminated in consolidation. *Id.* at Bates 000147.

Company in a net *creditor* position in each of fiscal years 2013 through 2016 vis-à-vis RAWA "and another affiliate." In those years, the Company had receivables in the amounts of $1,578,921, $1,371,703, $1,640,108 and $1,575,208 respectively, for "general expenses paid by the Company."[121] In other words, Bundy and its subsidiaries appear to be owed significant funds from RAWA and JJFMS entities on a yearly basis for general expenses the Company paid on their behalf.

Mr. Looney did testify regarding Debtors' cash flow position. Mr. Looney is an independent director that was hired postpetition in response to concerns expressed at the first day hearing in this case regarding overall corporate governance and the potential for conflict between Debtors and other JJFMS entities in Debtors' decision making process.[122] Mr. Looney testified that he was brought in to review the debtor-in-possession financing, and in that connection has reviewed the company's financials and its cash flow. He testified that Debtors' cash flow was insufficient to maintain their operations.[123] On direct examination, he was not asked to elaborate on his answers, distinguish among the two debtors or testify to the specifics of any documents he had reviewed. On cross examination,

---

[121] Related Party Transactions, *Id.* at Bates 000150. No information on this item was provided other than the Audited Consolidated Balance Sheet. So, it is not possible to know what portion of this receivable is owed from RAWA. But, given the relative consistency of the receivable across the years, if one were to attribute to RAWA the amount shown on the Schedules, ($725,379), Bundy would still be owed substantial amounts from a JJFMS entity.

[122] First Day Hr'g Tr. 54–60. Upon questioning from the staff attorney for the Office of the United States Trustee and the Court, we learned that Mr. DeLorenzo, Debtors' witness at the first day hearing, has been employed by Mr. Fitzgerald since 1985 and serves at his pleasure both in connection with Debtors and with non-debtor entities. The relative size of RAWA and Bundy to Mr. Fitzgerald is seen in Mr. DeLorenzo's testimony, in which he stated that he oversees $57 million worth of credit lines for All Car Leasing, oversees 120 employees for the entities he manages, and the entire JJFM family of businesses employ approximately 1000 employees. Rent-A-Car and Bundy, together having only 13 employees. *Id.* at 51–52.

[123] Trial Day 1 Hr'g Tr. 219–21.

it became clear that Mr. Looney's sole focus was on the two Debtors. He had no knowledge of Bundy's subsidiaries, their respective financial situations or the JJFMS businesses.[124] It is not clear that he reviewed (or was given access to) unconsolidated information.

Once again, the documentary evidence raise questions about the witness testimony. The Audited Financials reflect that the Company had positive cash flows from Operating Activities and positive cash at the end of the year (after taking into account cash flows from significant purchases of property and equipment). The Audited Financials show:[125]

**Table 3.  Year End Cash Positions:**

| Fiscal Year Ended | Net Cash Provided by Operating Activities | Cash at End of Year |
| --- | --- | --- |
| 7/31/2013 | $498,139.00 | $603,340.00 |
| 7/31/2014 | $1,297,362.00 | $553,357.00 |
| 7/31/2015 | $3,190,830.00 | $411,435.00 |
| 7/31/2016 | $225,822.00 | $367,005.00 |

At the very least, the Audited Financials call into question the Debtors' unsupported, conclusory statements that they are cash flow negative.

Seventh, both Mr. Steinbarth and Mr. Looney testified that neither JJFMS nor any non-debtor affiliate was obligated to provide Debtors with any further financing or advances. Mr. Looney also testified that he thought it would be difficult to obtain additional financing. But, Debtors did not provide any testimony regarding any actual exploration of third party financing, either prior to or after the bankruptcy filing.

---

[124] *Id.* at 228–36.
[125] Schwartz Ex. 51 Bates 000146.

Eighth, as for litigation, the cases that assess this factor examine whether litigation poses a significant threat to the debtor's financial situation.[126] Here, any litigation threat is not an unmanageable number of large claims or even a judgment that Debtors would be unable to satisfy. Prepetition, Bundy represented to its franchisees that it was management's opinion that the litigation with Mr. Schwartz "is not likely to have material impact on the companies' operations or financial performance."[127] At the hearing, there was no testimony to the contrary.[128]

Debtors attempt to make up for their evidentiary deficit in their post-trial brief, making three arguments to support a contention of financial distress. Relying on their Schedules, which show total liabilities in excess of total assets, Debtors state that the value of Bundy's intellectual property (i.e. its trademarks) would need to exceed $3 million "for there to be any liquidation value for unsecured creditors, let alone equity."[129] The import of this statement appears to be a request that I infer that the trademarks are not worth $3 million and therefore that the Debtors are insolvent. I decline the invitation to consider this new found position, which has no basis in the record.[130]

---

[126] *Integrated Telecom*, 384 F.3d at 129 ("Moreover, the record demonstrates that the securities class action did not present a significant threat to Integrated's finances.")

[127] Schwartz Exhibit 48 Bates 000208; Schwartz Exhibit 49 Bates 000392

[128] Debtors' expressed concern of continuing litigation fees and the annoyance of future litigation with Mr. Schwartz is discussed below.

[129] Debtors' Post-Trial Brief 3 n.3.

[130] Debtors make a valid point during argument that the assets of Bundy's wholly owned subsidiaries are not assets of Bundy's estate and do not need to be disclosed on Bundy's Schedules. But, the value of Bundy's equity interest is an asset of the estate and the value of Bundy's subsidiaries, therefore, is a relevant inquiry. *See, e.g., Alta+Cast*, 2004 WL 484881 at *5. Wholly owned subsidiaries exist for the benefit of their parent. Under the circumstances of these cases it is not a proper bankruptcy purpose to seek to use bankruptcy to restructure and/or eliminate a subsidiary's debt.

Debtors also point to RAWA's 2015 net operating losses. As set forth above, these losses appear largely historical. Other than the admittedly large litigation fee component, there is no evidence of the genesis of the losses, including whether they came from Bundy or one of its non-debtor subsidiaries.

Finally, Debtors attempt to raise evidence adduced at the debtor-in-possession financing hearing and they quote findings from the final order approving that financing. I will not consider this evidence. The evidentiary record on the Motion to Dismiss is closed. Further, Mr. Schwartz was not present at the financing hearing and so has had no opportunity to cross-examine the witnesses or otherwise explore the evidence adduced at that hearing. Also, the final order was entered after an uncontested hearing.

Based on the record, I cannot conclude that Debtors were in financial distress when they filed their petitions. They were solvent, they were not facing pressure from unaffiliated creditors, nor material litigation. It is unclear whether Debtors were cash flow positive or not. The cursory testimony offered by Debtors' witnesses on this point only leaves questions, particularly after reviewing the documentary information in the record. The lack of credible facts demonstrating financial distress supports a finding that these cases were not filed in good faith.

### B. The non-financial evidence does not support a finding of good faith.

A consideration of the non-financial evidence adduced at the hearing also supports a finding that these cases were not filed in good faith. To reiterate, the Third Circuit focuses on whether the petition serves a valid bankruptcy purpose and whether the petition is filed to obtain a tactical advantage, but this focus does not in any way limit consideration of

other facts and circumstances.[131]  While the good faith inquiry is more an objective analysis

of whether the debtor has crossed the equitable limitations on bankruptcy filings, a debtor's

subjective intent may also be relevant in considering the totality of the circumstances.[132]

Here, Debtors repeatedly state that their "valid reorganizational purpose" is

threefold: to maximize the value of their trademarks by rejecting underperforming or

burdensome agreements, to eliminate the risk of further litigation with Mr. Schwarz, and to

relieve their balance sheet of significant debt (or, alternatively stated, to manage/restructure

their debts to their parent, other affiliates and vendors).

I find that the primary purpose of the bankruptcy filing is to reject Mr. Schwartz's

franchise agreement so Debtors can open the Los Angeles territory to multiple royalty-

paying franchisees.  Debtors have been attempting to capture the Los Angeles territory since

RAWA came under the control of JJFMS and Mr. Fitzgerald.  After nine years of litigation,

two trips to the Fourth Circuit and $2.7 million in attorneys' fees and costs, Debtors state

that they finally accept the conclusion that Mr. Schwartz has an implied-in-fact, exclusive,

royalty fee Rent-A-Wreck franchise in the Los Angeles territory.  Debtors now turn to this

forum to reject Mr. Schwartz's agreement.  It is easy to conclude that if Debtors did not

think they could reject Mr. Schwartz's franchise agreement (and gain the benefit of his

territory), they would not have filed these bankruptcy cases.

Debtors defend their decision to file bankruptcy and argue that good faith exists

because they are trying to "maximize the value of their key assets, i.e., the Rent-A-Wreck

name and marks."[133]  They contend that this use of the Bankruptcy Code is not bad faith,

---

[131] *Id.*
[132] *Id.* (citing *SGL Carbon*, 200 F.3d at 165).
[133] Debtors' Post-trial Brief 7.

and can support a finding of good faith.  Moreover, Debtors affirmatively state that "maximizing the value of their trademarks and tradename by rejecting burdensome contracts" is a valid reorganizational purpose.[134]  Debtors emphasize that financially troubled entities may use the Bankruptcy Code when they "seek a chance to stay in business" or "seek to create or preserve some value that would otherwise be lost . . . outside of bankruptcy."[135]  The argument appears to be, therefore, that the rejection of the Schwartz franchise agreement maximizes Debtors' assets thus permitting them to stay in business, satisfying both prongs of the bankruptcy purpose.

I disagree.  Debtors misconstrue the Third Circuit's words.  In leaving out a portion of the quoted language from *Integrated Telecom*, Debtors pervert the meaning.  The Third Circuit does not state that the relevant inquiry for purposes of good faith is a desire to maximize the value of a debtor's assets.  Rather, the Third Circuit states:

> "To be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code.  It must seek to create or preserve some value that would otherwise be lost—*not merely distributed to a different stakeholder*—outside of bankruptcy.[136]

One of the purposes of chapter 11 is to "maximize property *available to satisfy creditors."*[137]  The good faith inquiry, therefore, is "particularly sensitive" where the "petition seeks to distribute value directly from a creditor to a company's shareholders."[138]

Here, Debtors' purpose in filing these cases is nothing more than a straightforward attempt to take value that belongs to Mr. Schwartz and give it to Bundy.  The filing of the

---

[134] *Id.*
[135] Debtors' Post-trial Brief 8.
[136] *Integrated Telecom*, 384 F.3d at 128–29 (emphasis supplied).
[137] *Id.* at 129 (quoting *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)).
[138] *Id.*

petition does not create (or preserve) value that is lost outside of bankruptcy. It is true that the value of the Los Angeles territory cannot be exploited by Debtors outside of bankruptcy, but the value of the Los Angeles territory (and, thus, the Rent-A-Wreck trademark) exists to be exploited by Mr. Schwartz. In filing the bankruptcy petitions to reject Mr. Schwartz's franchise agreement, Debtors seek to redistribute the value of exploiting the trademark in the Los Angeles territory from Mr. Schwartz to Bundy. Given Debtors' solvency and the paucity of unaffiliated debt, the primary, if not sole, beneficiaries of that value would be JJFMS and Mr. Fitzgerald, not the creditors of these estates.[139]

Moreover, Debtors need not file a bankruptcy case in order to relieve their balance sheet of significant debt or to manage/restructure their debt to JJFMS and affiliates. The entire secured debt is owed to JJFMS. This debt matured six years ago, and no efforts have been made to collect it. If JJFMS wants to forgive that debt, it can. If JJFMS wants to be paid back, it can cause RAWA and Bundy to expand into lucrative territories other than Los Angeles. Or, JJFMS could sell Debtors, or their assets, free and clear of its liens. None of those actions need to occur in a bankruptcy court.

Similarly, Debtors do not need to avail themselves of the bankruptcy court to address their unsecured debt. Mr. Steinbarth testified that the unsecured debt did not drive the filing. That is easy to see. As shown in Table 2, Debtors' combined general unsecured debt totals $4,703,332.53. Of that, eighty-eight percent (88%), or $4,139,353.00, is owed to wholly owned subsidiaries and another eight percent (8%), or $376,039.28, is owed to

---

[139] *Id.* at 119–20. The language used by the Third Circuit in expressing bankruptcy purpose is preservation of a "going concern" and maximizing value "of the *estate.*" The language is not maximizing the value of the *debtor.*

affiliates. Debtors, who are privately owned, do not need to file a bankruptcy case to restructure their intercorporate debt, particularly debt owed to their subsidiaries.

Debtors may take issue with this assessment as they argue that a court cannot ignore or discount affiliated debt in a good faith analysis. They cite *PPI*[140] and *Alta+Cast*[141] for this proposition. In *PPI*, the debtor owed $50 million in debt to its *parent*, which went unchallenged, leaving the debtor *insolvent*.[142] In those circumstances, the Third Circuit stated that *PPI* "stands for the proposition that an insolvent debtor can file under Chapter 11 in order to maximize the value of its sole asset to satisfy *creditors*, while at the same time availing itself of the landlord cap under § 502(b)(6)."[143] In *Alta+Cast*, the debtor's good faith was challenged at the plan confirmation stage. In that context, and on the record presented, the court ruled that the debtors' financial distress was evident and proceeded to confirm a plan that included insider debt (apparently owed to officers and shareholders), but also dealt with third party secured debt.[144] The insiders' secured debt was treated under the plan, but only non-insider unsecured debt received a distribution under the plan; general unsecured debt held by insiders received no recovery, neither did shareholders.[145] Neither of these cases stand for the proposition that a court should ignore the realities of a debtor's debt structure or a debtor's stated goals. Here, with a solvent debtor and ninety-six (96%) of the debt owed to affiliates (eighty-eight percent (88%) to *subsidiaries*), *PPI* and *Alta+Cast* do not

---

[140] *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 201 n.3 (3d Cir. 2003).

[141] *Alta+Cast*, 2004 WL 484881 at *5.

[142] *PPI*, 324 F.3d at 201 n.3.

[143] *Integrated Telecom*, 384 F.3d at 123. Debtors relied heavily on *PPI* in filing their cases. Their reliance was misplaced. As set forth *supra* n.77, use of the provisions of the Bankruptcy Code is not a bankruptcy purpose. Moreover, *PPI* has been limited as noted in *Integrated Telecom*. *See also Derma Pen*, 2014 WL 7269762 at *8 ("The filing of a chapter 11 petition to take advantage of rights provided by the Bankruptcy Code was explored more thoroughly in *Integrated Telecom*.")

[144] *Alta+Cast*, 2004 WL 484881 at *3.

[145] *Id.* at *1.

suggest, much less mandate, that Debtors need to use bankruptcy to relieve their balance sheet of significant debt.

Finally, Debtors suggest that they seek to use the Bankruptcy Code to reject non-performing franchise agreements with parties other than Mr. Schwartz. And indeed, an order approving the rejection of six franchise agreements was entered on an uncontested basis. But having considered the evidence, I conclude that these rejections were just an added benefit of the filing. Mr. Steinbarth testified that while Debtors could seek to terminate franchises outside of bankruptcy it would not be "as efficient."[146] As an example, he testified that in one particular termination litigation, a franchisee successfully challenged Debtors' choice of forum clause and Debtors were forced to litigate in Seattle, Washington rather than Maryland.[147] He could not recall the cost of that litigation. And he admitted Debtors made no attempts to terminate the six rejected franchise agreements at any time prior to the bankruptcy filing.[148] Certainly efficiency alone would not justify these bankruptcy filings.

Nor was there testimony that Debtors have taken any other steps to prevent a bankruptcy filing or to make themselves more profitable. It is not unusual for a debtor to recount steps taken prepetition to cut expenses, refinance debt or sell assets. Here, no such evidence was presented, which is consistent with the stated reasons for the bankruptcy filing. Debtors do not argue that they filed to reduce expenses or to refinance; they do not argue that their business model has somehow failed or needs fixing. Rather, Debtors state that they wish to "maximize the value of their trademark." Even so, Debtors offered no

---

[146] Trial Day 1 Hr'g Tr. 63.
[147] *Id.* at 63–64.
[148] Trial Day 1 Hr'g. Tr. 82. Mr. Steinbarth could not answer whether default letters had been sent.

evidence of any prepetition efforts to maximize the value of their trademark other than attempting to obtain the Los Angeles territory for their own benefit.

Debtors did not consider expanding into other territories as a way to maximize their trademarks. Mr. Steinbarth testified about Debtors' decision making process in filing the bankruptcy petitions. He stated that the contempt proceedings in the Maryland District Court Litigation in 2016 prompted Debtors to re-examine the business. The options considered were to leave the status quo (with the risk of future litigation with Mr. Schwartz of unknown cost), shut the company down, sell the company or try to reorganize with the benefits of the Bankruptcy Code.[149] After considering those options Messrs. Fitzgerald, Cash, DeLorenzo, Jaffee and Smith (all loyal to JJFMS) made the decision to file the bankruptcy cases.[150] Maximizing their trademarks by making concerted efforts to open or expand into new or existing territories was not considered, even though Debtors' 2017 Franchise Disclosure Documents offer airport franchises in more than 100 locations, including such locations as Orlando, Atlanta, Denver, Phoenix, San Francisco and Tampa.[151]

---

[149] Mr. Steinbarth also testified that with the benefits of a bankruptcy filing, Debtors "could re-emerge like the phoenix from the ashes, and really have the company that we wanted to have when we bought it in 2006." Trial Day 1 Hr'g Tr. 55. When JJFMS bought the company, it knew that Mr. Schwartz had a royalty free franchise in Los Angeles. Memorandum from Gregg J. Steinbarth to Jack Fitzgerald and Gary Jenkins (Dec. 9, 2005), Schwartz Ex. 46; Schwartz Ex. 47 5.

[150] Trial Day 1 Hr'g Tr. 54–55.

[151] Schwartz Ex. 51 Bates 000015. The initial franchise fee of $75,000 for the Orlando, Florida airport location is the same as the Los Angeles location. *Id.* The initial fees for each of the airport locations in the Atlanta, Denver, Miami, Phoenix, San Francisco and Tampa markets is $45,000. *Id.* The only other testimony adduced at the hearing regarding other territories was on cross examination. Mr. Looney testified that Debtors could, "hypothetically" sell franchises in Chicago or Kansas City or Houston. Trial Day 1 Hr'g Tr. 240–41. But, he implies that somehow the Los Angeles territory is better or, perhaps a more logical source of funds, because Mr. Schwartz is not paying franchise fees.

In their post-trial brief, Debtors suggest that their decision to "expand the LA territory" rather than "expand into a new territory" rests on established name recognition, and cannot be questioned as an exercise of Debtors' business judgment. Citing *In re HQ Global, Inc.*,[152] they argue that the "desire to expand operations in viable territories" is a proper use of the rejection power" and that Mr. Schwartz's suggestion that Debtors expand in other territories is simply an attempt by Mr. Schwartz to substitute his business judgment for Debtors'. There are at least three reasons why Debtors' argument is incorrect. First, Debtors did not put on any evidence regarding name recognition in Los Angeles versus any other territory, or suggest that name recognition had any bearing on their decision of how to "maximize their mark." Second, the *HQ Global* case is a decision on a motion to reject, not a decision on a motion to dismiss for lack of good faith, so the business judgment standard is not applicable. Third, the court is entitled to—in fact, directed to—look at the totality of the circumstances when analyzing the good faith of a petitioning debtor, including both objective factors and subjective intent.

If Debtors were truly in financial distress or seeking to preserve their business, they would be exploring opportunities to expand into other markets and minimizing their litigation expenses relative to Mr. Schwartz and the Los Angeles franchise. The fact that this option was not even given a thought is telling. Having read the documentary evidence of the Maryland District Court Litigation and the decisions that stem from it, it is clear that Debtors have put all their effort into obtaining the Los Angeles territory. Thus, although

---

[152] *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 512 (Bankr. D. Del. 2003).

these cases are not a classic "two party" dispute, they have the sense of one.[153]  Moreover,

these cases are a prime example of the situation the Third Circuit warned against: the use of

the Bankruptcy Code—and, in particular, its redistributive provisions—when a party is

willing to pay the freight of a bankruptcy case.  Here, Debtors are simply continuing their

prepetition litigation in another forum.  These privately-owned Debtors have determined

that ridding themselves of Mr. Schwartz is worth the cost, and they are able to do so

because Mr. Fitzgerald controls both the debt and equity.

  These bankruptcy filings have not eliminated further litigation with Mr. Schwartz.

Instead, it has accelerated it.  If, as Debtors' profess, they had truly accepted that Mr.

Schwarz has an implied-in-fact franchise agreement with Bundy, the bulk of the litigation

and the attendant expenses would be behind them.  While the lack of contours around the

franchise agreement creates uncertainties, this was a choice Debtors made when they

refused Judge Messitte's offer to determine the parties' remaining obligations.  I understand

the desire to eliminate litigation with Mr. Schwartz and there is no guaranty that Debtors

will not be embroiled in litigation with him in the future.  The most recent rounds of

litigation, however, stemmed from RAWA's refusal to properly list Mr. Schwartz's location

on the RAWA website and its call center's misstatements regarding the Los Angeles

---

[153] *See e.g. In re Sullivan*, 522 B.R. 604, 616 (B.A.P. 9th Cir. 2014) ("[t]ypical bad faith two-party dispute cases may involve delays on the eve of trial (litigation tactics), forum shopping, new-debtor syndrome (special purpose entities), repeat filers, and repeatedly delayed foreclosure sales."). *See also Advanced Restoration Techs. v. Shortgrass, Inc. (In re Advanced Restoration Techs.)*, No. Civ. A. 05-2978(JLL), 2006 WL 827841 (Bankr. D.N.J. Mar. 30, 2006) (two party dispute did not arise from a debtor-creditor relationship, but from a licensing contract dispute); *Steinman v. Spencer (In re Argus Group 1700, Inc.)*, 206 B.R. 737, 755–56 (Bankr. E.D. Pa. 1996) (dismissing case where debtor engaged in forum shopping) *aff'd sub nom Argus Grp. 1700, Inc. v. Steinman*, 206 B.R. 757 (E.D. Pa. 1997).

franchise.[154] Debtors can control their own behavior, so litigation should be less likely.  In any event, Debtors cannot fabricate the basis of a good faith filing by their desire to avoid the results of their own provocative actions.

Rather than face the prospect of potential future litigation, Debtors have chosen certain litigation, and in doing so have simply exchanged one set of issues for another and the expense of civil litigation for that of bankruptcy litigation.[155]  Not surprisingly, the bankruptcy filing triggered litigation over its very existence.  It has also spawned litigation over rejection of Mr. Schwartz's franchise agreement, which is unlikely to end with the decision on assumption or rejection.  Debtors have waded into the unsettled area of rejection of trademark licenses.  Even if I were to approve the rejection of Mr. Schwartz's franchise agreement, further litigation is certain to follow over the effect of rejection and whether Mr. Schwartz may continue to use the Rent-A-Wreck trademark and enforce his exclusive license in the Los Angeles territory notwithstanding rejection.[156]  To the extent

---

[154] Judge Messitte's Opinions and Orders detail Debtors' misconduct, which is not repeated herein.

[155] *Derma Pen*, 2014 WL 7269762 *9 n.18 ("Although the litigation costs must be considered in this analysis, in this case, filing to avoid the mounting litigation costs falls more on the side of a litigation tactic rather than a need to reorganize. Here, the Debtor has merely exchanged its litigation costs for administrative costs in bankruptcy.").  To date, Debtors' attorneys have submitted applications seeking attorneys' fees and expenses totaling $625,000 for work performed through December, 2017. *See* ECF Nos. 216, 217.

[156] *See In re Tempnology, LLC*, 879 F.3d 389 (1st Cir. 2018) (trademark licenses are unprotected from court-approved rejection); *Sunbeam Prod., Inc. v. Chicago Am. Mfg., LLC* 686 F.3d 372 (7th Cir. 2012) (rejecting equitable approach to trademark licenses; ruling that rejection of a contract is merely a breach and does not "vaporize" the rights of the non-debtor party); *In re Exide Technologies*, 607 F.3d 957, 964–68 (3d Cir. 2010) (Ambro, J., concurring) (bankruptcy court should have used its equitable powers to provide debtor with a fresh start without stripping trademark licensee of its rights); *In re Crumbs Bake Shop, Inc.*, 522 B.R. 766 (Bankr. D. N.J. 2014) (examining both *Exide* and *Sunbeam* in concluding that § 363 sale did not extinguish trademark licensee rights in the absence of consent; licensees are entitled to continue to use trademark licenses granted to them for the remainder of their terms).

appeals are taken, the litigation could last for years and no doubt the parties would litigate the issue of a stay pending appeal.[157]

Based on the totality of the circumstances, I conclude that these cases were not filed in good faith. By its nature, this decision is limited. In another circumstance, a financially distressed debtor's recognition of the outcome of litigation and/or a desire to avoid future litigation may serve as a legitimate basis for the filing of a bankruptcy case. But here, I have no doubt these petitions were just another chapter in the attempt to terminate Mr. Schwartz's franchise and obtain the benefits for JJFMS. These bankruptcy petitions fall on the dark side of the spectrum ranging from the clearly acceptable to the patently abusive.

## Conclusion

For the reasons set forth above, I will grant the Motion to Dismiss. An order will follow.[158]

Dated: February __13__, 2018

_Laurie Selber Silverstein_
LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[157] *See, e.g., In re Revel AC, Inc.*, 802 F.3d 558, 572 (3d Cir. 2015) (reversing bankruptcy and district court denials of stay pending appeal and imposing stay in favor of lessee of orders allowing sale free and clear of lessee's possessory interests after weighing harms to both lessee and debtor, including lessee's opportunity to operate a profitable business); *In re A & F Enterprises, Inc., II*, 742 F.3d 763 (7th Cir. 2014) (reversing bankruptcy and district court denials of a stay pending appeal and imposing a stay in favor of the debtor/IHOP franchisee of orders deeming building leases rejected and franchise agreements expired after weighing loss of business to franchisee and obligations of franchisor during appeal).

[158] Because I am dismissing the bankruptcy cases, I am not ruling on the alternative relief requested in the Motion to Dismiss.